### NANCY JACKSON *against* BULLOCH.

The owner of a slave, born in a slave-holding state, has no right, by comity, to hold such person in slavery here.

There is nothing in the constitution of the *United States* applicable to slaves, voluntarily brought into this state, by their masters.

Slavery, to some extent, has been recognized, by the laws of this state.

The constitution of this state does not vary the relation of master and servant, as by law established, at the adoption of that instrument.

By the statute of 1774, prohibiting the importation of slaves into this state, and the statute of 1784, declaring that no persons of colour born after that time, should be held in servitude after they arrived at the age of twenty-five years, the legislature intended to provide for the final extinction of slavery in this state.

The design of the former statute was to prevent the increase of slaves in this state, by importation from abroad.

To bring the case of a slave brought into this state and *left* here, by the master, within the prohibition of that statute, it is not necessary to show an intention of the master to reside here permanently, or to suffer the slave to remain here permanently.

A slave-holder, who is an inhabitant of another state, can here claim no greater privileges, with respect to his slave, than our own citizens.

Therefore, where *A*, born in the state of *Georgia*, in 1813, was, by the laws of that state, the slave of *B*, an inhabitant of that state, claiming to have his domicil there; in *June* 1835, *B* came into this state, with his family, for a temporary residence, bringing *A* with them; his family remained here at board, until *June*, 1837, *A* being constantly with them and in their service; from the 20th of *October*, 1835 to the 2nd of *May*, 1836, and from the 22nd of *October*, 1836 to the 28th of *March*, 1837, *B* was absent from this state, at his residence in *Georgia;* and he intends to return there, and take *A* with him; on a writ of *habeas corpus*, brought by *A*, it was held, that *A*, under these circumstances, was brought into and *left* in this state, within the prohibition of the statute of 1774; that *A*, being within the purview, and not within the exception of the statute of 1784, was free, by the laws of this state; that the foreign domicil of *B* and his *animus revertendi* gave him no peculiar privilege with respect to *A;* and consequently, that *B* could no longer hold *A* in servitude. [By three Judges against two.]

*Hartford,*
June, 1837.

Nancy Jackson
*v.*
Bulloch.

THIS was a writ of *habeas corpus*, before Ch. J. *Williams*, on the application of *Nancy Jackson*, by her next friend *James Mars*, alleging, that she then was, and for a long time had been, illegally confined, by *James S. Bulloch*, then residing in *Hartford*.

The return stated, as the cause of detention, that *Nancy* was born in the state of *Georgia*, in the year 1813; that by the laws of said state, she is a slave and the property of the defendant, who is a citizen of that state; that in the month of *June*, 1835, the defendant came to the state of *Connecticut*, with a view to a temporary residence therein, and with an intention to return to *Georgia ;* that he brought *Nancy* with him, and she has continued in his service from that time until the issuing of this process; that his residence in this state is, and has been, for a temporary purpose; that he intends, and ever since he came to this state has intended, soon to return to

the state of *Georgia*, with her; that his domicil is, and ever has been, there; that he came to *Connecticut*, on the 16th of *June*, 1835, remained here until the 20th of *October* of the same year, then returned to his residence in *Georgia*, where he remained until the 2nd of *May*, 1836, when he again came to *Connecticut* and remained here until the 22nd of *October*, 1836, when he again returned to *Georgia* and resided there until the 28th of *March*, 1837, and then came again to *Connecticut ;* that his family have been in *Connecticut* at board, from the 16th of *June*, 1835, to the present time, *June*, 1837 ; and that during this period, *Nancy* has continued with them, in their service.

The complainant, admitting the truth of these facts, claimed, that they were insufficient to justify her detention. The Chief Justice reserved the case for the consideration and advice of this court.

*Sherman* and *Chapman*, in support of the return.

*Hungerford* and *W. W. Ellsworth*, contra.

WILLIAMS, Ch. J.   The question in this case is, whether *Nancy Jackson*, the petitioner, can, by the laws of this state, be detained here longer, in a state of slavery ; and it is a question of deep interest to this community, how far our laws tolerate slavery within our limits.

That every human being has a right to liberty, as well as to life and property, and to enjoy the fruit of his own labour ; that slavery is contrary to the principles of natural right and to the great law of love ; that it is founded on injustice and fraud, and can be supported only by the provisions of positive law, are positions, which it is not necessary here to prove.   Indeed, a discussion of many of the principles contended for, on the part of the applicant, has become unnecessary, in this case, in consequence of the admissions made by the counsel for the respondent.   It was expressly conceded, that slavery was a system of such a character, that it can claim nothing by the law of comity, which prevails among friendly states upon subjects of a different class : that it was local, and must be governed entirely by the laws of the state, in which it is attempted to be enforced. We do not, therefore, propose to examine the authorities, which

have been cited, but refer to the able opinion of the supreme court of *Massachusetts*, in the case of *The Commonwealth v. Aves*, decided in *August*, 1836, and the authorities there cited. *Somerset's* case, 20 *State Trials*, 1. (by *Howell.*) S. C. *Lofft* 1. *Lunsford* v. *Coquillon*, 14 *Martin* 404. *Story's Conflict of Laws*, 92. 97. *Rankin* v. *Lydia*, 3 *Marshall* 470. *Forbes* v. *Cochrane*, 2 *Barn. & Cres.* 448.

It was further admitted, by the counsel for the respondent, that there is nothing in the constitution of the *United States* applicable to this case: That the article in that instrument providing, that persons held to service in one state, *escaping* into another state, shall not thereby be discharged, but shall be delivered up, upon claim of the party to whom such labour or service was due, applied only to slaves escaping from their masters, and not to those voluntarily brought in by them. And had it not been admitted, two decisions of an eminent Judge of the supreme court of the *United States*, himself a slave-holder, would have settled the question. *Butler* v. *Hopper*, 1 *Wash. C. C. Rep.* 499. Ex parte *Simmons*, 4 *Wash. C. C. Rep.* 396.

And from this it necessarily follows, that the respondent, although an inhabitant of a sister state, can have no other or higher claims than an inhabitant of a foreign state or nation with whom we are in amity. For it has been decided, by the state court of *Virginia*, and by the same learned Judge above alluded to, and also by the supreme court of the *United States*, that for all national purposes, embraced by the federal constitution, the states and the citizens thereof are one, united under the same sovereign authority, and governed by the same laws. In all other respects, the states are necessarily foreign to each other; their constitutions and forms of government being, although republican, altogether different, as are their laws and constitutions. *Buckner* v. *Finley* & al. 2 *Pet.* 586. 590. *Lonsdale* v. *Brown*, 4 *Wash. C. C. Rep.* 154. *Warden* v. *Arell*, 2 *Wash.* 298.

The case, therefore, as presented to this court, comes divested of that importance, which arises from a supposed connexion with a great constitutional question, upon a subject highly interesting, and of such a nature as not even to be named in the instrument which binds together these *United States*. And it is to be decided upon the same principles, as if the parties

*Hartford,*
*June, 1837.*

Nancy Jackson
*v.*
Bulloch.

were inhabitants of any foreign country, with which we are at peace and in amity, where slavery is tolerated. Still, as the liberty of a human being and the character of our laws in relation to this interesting subject, are involved, the question is an important one.

In *England,* it is well settled, that slavery does not exist in that country; that a slave coming from another country—even their own colonies—was free, the moment he placed his feet upon *English* ground. *Somerset's* case, *Lofft,* 1. "The laws of *England,*" says their eloquent commentator, "abhor, and will not endure, the existence of slavery within the nation." 1 *Bla. Com.* 424. And it is the boast of their judges, that slavery is inconsistent with the genius of their constitution. *Forbes* v. *Cochrane,* 2 *Barn. & Cres.* 448.

It is said, however, this is not our law; because slavery exists here, to a certain extent. It cannot be denied, that in this state, we have not been entirely free from the evil of slavery; and a small remnant still remains to remind us of the fact. So far as slavery is sanctioned by law, so far those who are to expound the law, are to give it effect, but no further. How or when it was introduced into this state, we are not informed. We find no traces of it in our earliest statutes. It probably crept in silently, until it became sanctioned, by custom or usage. Did it depend entirely upon custom or usage, perhaps it would not be too late to enquire, whether a custom so utterly repugnant to the great principles of liberty, justice and natural right, was that *reasonable* custom, which could claim the sanction of law. But we find, that for nearly a century past, the system of slavery has been, to a certain extent, recognised, by various statutes, designed to modify, to regulate, and, at last, abolish it; and thus, we think, it has received the implied sanction at least of the legislature.

The question, however, arises, to what extent was slavery permitted; and how far is it now tolerated? The counsel for the petitioner contend, that slavery does not exist at all in *Connecticut,* or, if it exists at all, it is only as to persons born before the year 1784, and, of course, not as to this woman. This they attempt to show from the constitution of this state, and from legislative enactments.

First, by the constitution. The bill of rights, in its 1st section, declares, that all men, when they form a social compact,

*Hartford,*
June, 1837.

Nancy Jackson
*v.*
Bulloch.

are equal in rights; and that no man, or set of men, are entitled to exclusive public emoluments or privileges from the community. The language is certainly broad; but not as broad as that of the bill of rights in *Massachusetts*, to which it has been compared. It seems evidently to be limited to those who are parties to the social compact thus formed. Slaves cannot be said to be parties to that compact, or to be represented in it. The very definition of a slave, as given in the *Louisiana* code, shews, that he could not be contemplated as a party to a national compact. "A slave is one, who is in the power of a master, to whom he belongs. The master may sell him, dispose of his person, his industry and his labour. He can do nothing, possess nothing, nor acquire any thing, but what must belong to his master." So, too, when by another article in the constitution, all coloured persons are excluded from the privileges of electors, it would seem as if all such persons were considered as excluded from the social compact.

The 8th section of the bill of rights has also been pressed upon us: that "the *people* shall be secure in their persons, houses, papers and possessions, from unreasonable searches or seizures." This is almost a transcript of the 4th article of the amendments of the constitution of the *United States*. And the fact that this amendment was adopted at all, and that amidst all the conflict of opinions upon the subject of slavery, this clause has never been claimed to affect that subject, shows very strongly, that it was not intended to apply to that description of persons. When the preamble to the constitution of the *United States* speaks of " WE THE PEOPLE—to secure the blessings of liberty to ourselves and our posterity, do ordain and establish this constitution," it cannot be seriously contended, that it included that class of people called slaves; and the term "people" in the bill of rights, must have been used in a similar sense. The 8th section of the bill of rights, then, cannot be intended to include slaves.

The 10th section of the bill of rights also provides, that "no person shall be arrested, detained or punished, except in cases clearly warranted by law." And under this, the petitioner rests a claim. But this only brings us back to the question, what detentions are warranted by law? If the power of a master over his slave is one recognized by law, then this article in the bill of rights cannot affect the question before the

*Hartford,*
June, 1837.

Nancy Jackson
*v.*
Bulloch.

court. And while this solicitude for personal liberty manifested in the constitution, makes it our duty to inquire, with great care, whether this detention is clearly warranted by law, we feel bound to declare, as the result of our examination of the constitution of this state, that its provisions do not, and were not intended to vary the relation of master and servant, as by law established, at the time of the adoption of that instrument. And in this opinion, the court are unanimous.

This brings us to the question, what was the state of our law upon this subject, at the time of the adoption of the constitution of this state : for it has not since been varied.

The first step taken for the suppression of slavery was at a time when the public pulse beat high in favour of liberty ; when our fathers were smarting under the oppressive acts of the *British* government; a short time after the decision in *Somerset's* case, which proclaimed liberty to the slave in *England ;* and a few months before the first blood was shed for liberty in this country, *viz.* in *October,* 1774. A law was then passed to prevent the importation of slaves into this state, by sea or land. And almost as soon as the war, which gave to us liberty and peace, had terminated, another law was enacted, declaring, that no negro or mulatto, born in this state after the 1st of *March,* 1784, should be held in servitude longer than until they arrived to the age of 25 years; which was subsequently reduced to 21 years.

Thus, it would seem, that ample provision was made for the final extinction of slavery in this state, as soon as the slaves then alive had passed from the stage. No attempt, indeed, was made to set at liberty those who were then in bondage ; but public opinion and the influence of these laws led to the voluntary emancipation of many. No general proclamation was made, that slavery was abolished. But as slaves could neither be imported into the state, nor raised within its limits, it would seem as if a foundation was laid for its final extinction, by these simple provisions. And such was the understanding at the time. An eminent jurist, who long occupied a seat upon this bench, and who felt a deep interest on this subject, says : " This law [of 1784] has laid the foundation for the gradual abolition of slavery ; for as the children of slaves are born free, being servants only until 25 years of age, the consequence is, that as soon as the slaves now in being shall have become ex-

tinct, slavery will cease, as the importation of slaves in future is prohibited." He adds : " As slavery is gradually abolishing, and will in a short time be extinguished, there being but few slaves in the state, it will be unnecessary, in this place, to make any remarks upon a subject that has so long engrossed the attention of the humane and benevolent part of mankind in the present age." 1 *Sw. Syst.* 220. And the editors of the statutes revised in 1821, of whom this same learned Judge was one, in a note to the " act to prevent slavery," remark : " The consequence of these acts has been, that there are now very few slaves ; and in a short time, slavery will no longer be a reproach to the state." *Stat.* 430. In pursuance of the same idea, the legislature have repealed all the statutes imposing restrictions and punishments on slaves ; and in the revision above alluded to, have entitled the only remaining statute upon this subject " an act to prevent slavery ;" in which are retained, the enactments of 1774 and 1784. Unless then, there is some defect in those statutes, which will prevent their operating in the manner intended, slavery in the state of *Connecticut,* (except as it respects the few born before the act of 1784,) is abolished. It may then become necessary to examine these statutes more in detail.

The first statute was as follows : " And whereas the increase of slaves in this state is injurious to the poor and inconvenient ; *Be it enacted,* that no indian, negro or mulatto slave shall, at any time hereafter, be brought or imported into this state, by sea or land, from any place or places whatsoever, to be disposed of, left or sold within this state."

From the preamble it appears, that the legislature considered slavery as an evil, a great evil ; and yet, with the wisdom and cautious policy that distinguished the men of the revolution, they did not assume the high ground that slavery is always a sin, and that it must be immediately abolished. They knew, too well, the effect of a custom, which had been so long uninterrupted, and which had been so wrought into the domestic relations of our citizens. They also knew the effect, which education and interest will have upon the judgment and feelings of a people ; and doubtless anticipated the agitation, which would have arisen, had they proceeded at once to the termination of this great work. Their first step, therefore, was one not intended to disturb subsisting relations, but to prevent

*Hartford,*
June, 1837.

Nancy Jackson
*v.*
Bulloch.

*Hartford,*
*June, 1837.*

Nancy Jackson
*v.*
Bulloch.

the growth of new ones ; not to interfere with what are claimed as vested rights, but to prevent the increase of the evil, by additions from abroad ; and the reason assigned is, that such increase is " injurious to the poor and inconvenient."

In the argument, the respondent's counsel claimed, that the law was designed to prevent the increase of paupers, rather than that of slaves, because the *poor* are spoken of. A little attention will show, that this is not the true construction. It is said, the increase of slaves is injurious to the poor and inconvenient. It is the increase of *slaves*, not of the poor, which is the evil spoken of. They say, indeed, such an increase of slaves would be injurious to the poor. How ? Certainly not because the poor would have to support them, but because slave labour would then be brought into competition with the labour of poor whites, tending to reduce the price of their work and to prevent their employment, and to bring the free labourer, in some measure, into the ranks with slaves. Such, we know, are the consequences of slavery, as it respects the free labourer. Truly, then, did the legislature say, that the increase of slavery was injurious to the poor and inconvenient. Clear it is, that this act has no relation to the subject of pauperism ; for long before this, there was a law forbidding the introduction of paupers into this state, and persons from harbouring them. Besides, the existing laws provided, that the owners of slaves should support and provide for them. The mischief, then, intended to be guarded against, by this statute, was, to prevent the increase of slaves, by additions from abroad. And it is the business of the court to give such construction to the statute as to suppress the mischief and advance the remedy ; or, in the language of Lord *Coke,* to " suppress subtle inventions and evasions for continuance of the mischief, and *pro privato commodo,* and to add force and life to the cure and remedy according to the true intent of the makers of the act, *pro bono publico."* *Heydon's* case, 3 Co. 7. If, then, the construction claimed by the respondent, would go, in a considerable degree, to impair or defeat the object in view ; if it would suffer the mischief, at which the statute was aimed, to increase ; we may well doubt, whether such a construction can be a correct one.

What then would be the consequences of that construction ? It cannot be denied, that this statute prohibits the importation of slaves, by citizens of other states, as well as by our own citi-

zens; and that our own citizens have at least equal privileges *Hartford,* on the subject with others. The claim here attempted to be June, 1837. supported, is, that persons may bring into this state, negro or Nancy Jackson mulatto slaves, in any number, and for any time their owners *v.* shall choose; (not to sell or dispose of)—provided they do not Bulloch. intend to remain here permanently, themselves; and do not mean that the slave shall remain here for life : that is to say, if the person who brings the slave here, can show, that he did not intend to remain here permanently, and did not mean his slave should remain here permanently, but that he intended, at some time, when it should suit his convenience or pleasure, to return with his slaves, then it would not be within the statute. Now, unless an inhabitant of another state or nation can, by comity, claim some privilege of this sort, which our citizens cannot, then any inhabitant of this state may also bring from abroad his negro slaves; or he may go abroad and hire slaves, and bring them to labour in this state; and if he may do it, in one instance, he may do it in another; and if he may hire one slave, to wait upon him, or cultivate his grounds, what prevents his hiring a hundred? The slave indeed could not be left here for life; but he may be hired for a term of years; and the contract of hiring for a term, would always prove that he was not to be permanently left. If this is a correct exposition of this statute, we see not why, under its operation, slaves may not again become the cultivators of our soil; and why we may not take from the slave-growing states, for a term of years, the crops of slaves which some of the new slave states have, by their recent laws, excluded. Surely, such a construction of the statute is not one which would tend to suppress the mischief in view.

Does the language of the statute require, or even admit, such a construction? It provides, that no indian, negro or mulatto slave shall, at any time hereafter, be brought or imported into this state, by sea or land, from any place or places whatsoever. Language can hardly be more comprehensive. No slave from the slave stock shall be brought or imported, at any time, by sea or by land, from any place or places, into the state. It seems as if the legislature were anxious that no loop-hole should be left. And had they stopped here, no doubt could have existed that the words of the act were as broad as the intent. But it is added, "to be disposed of, left or sold within this

*Hartford,*
*June, 1837.*

Nancy Jackson
*v.*
Bulloch.

state." These words, it is contended, qualify the preceding enactment, in such a manner, as to shew, that the case of the respondent is not within the statute. These words forming a part of the statute, are to be construed in connexion with the other part of the enactment, in such a manner as to give a full and fair effect to the intent of the legislature. It is not claimed, that *Nancy Jackson* was brought into this state to be sold or disposed of; and the respondent also insists upon it, she was not brought here to be *left.* On the other side, it is contended, that as she was brought here, and has been suffered to remain, for nearly two years, she has been *left* here, within the true intent and meaning of this statute. This brings us to the question, how far does this word "left" qualify and limit the previous provision of this statute? Must it be shewn, that the slave imported was to be *permanently* left in this state? Such a construction would greatly enervate the statute; and ought not, therefore, to be given, unless the language imperiously demands it.

How then is the term "left" to be understood? The word *leave*, from which this is derived, is used in a variety of senses; as to forsake, to abandon, to depart from, to suffer to remain, not to carry away. These, it is believed, are the only significations, which can be considered applicable to this case. The word "left" cannot have been used in the first sense; for it cannot be believed, that any one would bring his slaves here, merely to abandon or forsake them; or that such an event could have been thought so likely to happen, as to require this extraordinary interposition. The only inducement which could be supposed to exist, would be, that the master might thus free himself from the support of the slave. But as another statute provides, that masters shall support their slaves, even when emancipated, unless done by consent of the select-men, this provision would be unnecessary. Besides, the person so abandoned would no longer be a slave; for there would be no master; and the very idea of slavery implies, that the slave is one who is in subjection to the will of another. Nor can the term mean to depart from, or not to carry away his slave, unless it can be shewn, that so long as the owner remains in the state, as well as the slave, this statute cannot be violated. And if this construction is correct, it follows, that any citizen of another state or country may remove into this state with his slaves;

and so long as he remains with them, they are not "left," within the meaning of the statute, even although he may not intend to return.

What then does the word "left" mean in this statute? We must, when a term has different senses, keep in view the object contemplated by those who use it, in this, as in all other cases which may arise. Thus, if a law forbids the master of a vessel from landing foreigners upon our shores, and leaving them there, without a license, or without bonds, it would be a poor defence, that they had all agreed to return in his ship, at the end of two years, and therefore, he had not *left* them; or that he had not *left* them, because he remained in the country with them. Or, if a law to guard against contagious diseases prohibits the leaving, in any town in this state, of a person having the small-pox, would the fact that the persons who left the infected person in a town, remained with him, be any justification of the act? Or, would not such infected person be *left*, because he who brought him had not departed from him or abandoned him? Or, if we take a case expressly provided for by statute, which enacts, that any person who shall bring into this state any poor or indigent person, and *leave* him or her in any town within the same, &c., such person so bringing in and *leaving*, shall forfeit and pay, &c. What does the word "leaving" in that statute mean? Surely not abandoning, deserting, departing from, merely; but suffering the pauper, whom he had brought, to remain there. And the enquiry would not be, whether he intended such pauper should remain there for life, or for a term of years. We think, that the same construction should be given to the word "left" in this statute: no slave shall be brought from any place and suffered to remain in this state.

If it be claimed, that the word "left" is, in this way, made of no effect, we think otherwise, and that it has an important meaning. While the legislature were desirous of preventing the increase of slavery, on the one hand, they were not desirous of doing any thing, which might be considered unkind or unfriendly to the inhabitants of adjoining states, on the other. *New-York* and *Massachusetts* were then both slave states. It was not a time to provoke controversies with such powerful neighbours. While, therefore, this state exercised its undoubted right to prevent the increase of slavery among us, they meant

to do it in such a manner as not to give offence to our sister states, by impeding their citizens in travelling through this state, with their servants or slaves; but those slaves were not to be *left*, or suffered to remain here. In this way, slavery would not be increased among us, to the injury of the poor; nor would our friends from abroad be prevented from coming among us, and passing through our state, with their families.

If it be asked, how long they might continue here, before they could be said to be *left*, it is answered, that a liberal construction should be given to the term, depending upon circumstances, though two years could not be allowed, under any circumstances, except of imperious necessity. In those states, where a time is limited, by statute, for the allowed residence of slaves from other states, brought in by their masters, no state has extended the time to two years. *Pennsylvania* has limited it to six months; and *Virginia*, to a year. By the ordinance for the government of the *North-Western Territory*, and the constitution of *Illinois*, neither slavery nor involuntary servitude is permitted. A slave-holder from *Kentucky* removed into that state, with a view to reside there, accompanied by the plaintiff, who continued with her mistress in that state, about a month, as a slave. Her mistress then hired her out, in the state of *Missouri*, where she was taken sick, and brought back to her mistress in *Illinois*, where she remained until she was cured. She was then sold to a citizen of *Missouri*. And upon these facts, she claimed her freedom. The court of the state of *Missouri*, while they said, that emigrants or mere travellers passing through the state of *Illinois*, so long as they retained the character of emigrants or travellers, were not within the provisions of the constitution; and that they retained that character, so long as might be necessary, according to the common mode of travelling, to accomplish a transit through the state; said further, that something more than the mere convenience or ease of the emigrant ought to intervene to save him from the forfeiture; something of the nature of necessity should occur. And in that case, they pronounced the slave *Julia* to be free. *Julia* v. *McKinney*, 3 *Missouri Rep.* 270.

A slave, then, brought from another state or country into this state, may, in our opinion, be considered as *left* in this state, although the owner does not intend to reside here permanently himself, or to suffer such slave permanently to remain here.

So long as he is a traveller, passing through the state, he cannot be said to have *left* her here. But when he and his family are residing here, for years; and when he has suffered his slave to remain here, for almost two years; he cannot claim the privilege of a traveller, even although he intended, at some future time, to return with his family to his former residence.

The 17th section of the statute concerning Crimes and Punishments has been alluded to. That act punishes those, who kidnap free persons, or persons entitled to freedom, knowing them to be free, with intent to carry them out of the state, or to hold them in service or slavery against their will ; with a proviso, that nothing therein contained shall operate to prevent persons coming into the state, for a temporary residence, or passing through the same, from carrying with them their servants. *Stat.* 153. As the proviso intends only to limit the provisions of that section, which is conversant with free persons, or persons entitled to freedom, it is not perceived how it could be supposed to operate on this case, upon the supposition this woman is, by our laws, a slave; or how such a provision could have been necessary, as it respects slaves. But, were it otherwise, this act does not attempt to limit or alter the operation of those statutes, which had long existed in this state, or to militate against the construction here, but leaves the question as to what temporary residence is allowed under the then existing laws, entirely open as before.

It was said, with an air of triumph, by the counsel for the respondent, that he never intended to leave the slave here ; and the object sought by this writ is, to compel him to do the very thing that the statute forbids. This, at first, seemed plausible ; but it takes for granted the point in dispute, whether the slave has been already left here or not, within the statute. That is the question; for if she has been, it is not contended but his controul over her has ceased.

If it be said, that the return shows, that the respondent did not mean to leave his slave here, and therefore, it is not a case within the statute; we reply, in the language of the court of *Missouri*, in the case before cited : "Is it true, that if a person does not intend to do an act, and yet does it, that the act is not done ? If a person says, he does not intend to introduce slavery, and yet he does introduce it *de facto*, can the innocent intent save him from the forfeiture ?"

*Hartford,*
June, 1837.

Nancy Jackson
*v.*
Bulloch.

*Hartford,*
*June, 1837.*

Nancy Jackson
*v.*
Bulloch.

In the opinion of a majority of the court, it follows, that this slave has been brought and left in this state, contrary to the act of 1774 ; and therefore, that she cannot be claimed or treated as a slave, under our laws.

The statute of 1784, follows up and completes the system of abolition. The preamble shows the views of the legislature : " And whereas sound policy requires, that the abolition of slavery should be effected as soon as may be consistent with the rights of individuals and the public safety and welfare ; therefore, *Be it enacted,* that no negro or mulatto child, that shall, after the 1st day of *March,* 1784, be born within this state, shall be held in servitude longer than until they arrive at the age of 25 years, notwithstanding the mother or parent of such child was held in servitude, at the time of its birth ; but such child, at the age aforesaid, shall be free ; any law, usage or custom to the contrary, notwithstanding." The former law had declared the increase of slavery injurious to the poor and inconvenient ; and it was evidently intended to prevent the *increase* of slaves. This statute declares, that sound policy requires the abolition of slavery, as soon as consistent with public safety and individual rights. It was evidently intended to destroy the system entirely ; and to effect this, the legislature declare, that no coloured children, born in this state, shall be slaves. If the words " within this state" had been omitted, then this statute would, of itself, have operated so as that there could remain no such thing as slavery in this state, after the extinction of those slaves, who were born before the year 1784. The legislature, in their enactments, ordinarily intend to confine their operation to this state. It is for this state they legislate, and not for the world. In some statutes, they speak expressly of persons or places *within this state ;* in others, they do not. Thus, sign-posts shall be erected in the centre of every town *in this state,* or in each located society *in this state.* So, in various sections of the act concerning sickness, towns *in this state* are spoken of. So, when ships are to be set up, at any town or place *within this state,* surveyors are to be appointed. Each school society *in this state.* Stage drivers travelling on any road *in this state. Stat.* 621. 622. 617. 608. 581. 634. (ed. of 1808.) In the subsequent revision, in some instances, the language is changed, and these words are omitted as superfluous ; the revisers, no doubt, concurring with the

courts in *New-York*, who have expressly decided, that where a statute prohibited the bringing of paupers into any city or town, *within the state*, these words were surplusage; for the legislature had no right to make laws for any other state. *Thomas* v. *Ross*, 8 *Wend.* 674. If, in this case, it had been said, no child born after *March*, 1784, shall be a slave after 25 years of age, it might have had the appearance of legislating for others—of proclaiming liberty to all born in the country after that time. The language might have seemed at least offensive. The legislature, therefore, used language, not uncommon at that time, similar to that used in other statutes, which would have received precisely the same construction whether containing those words or not. Is it too much to say, that those words meant no more in this case than in the cases cited above; and that when they were attempting to abolish slavery, they may be fairly understood to mean, that persons born after that time shall not be held as slaves after they arrive at a certain age? Had the language of the statute been; whereas sound policy requires, that slavery should be abolished, as soon as is consistent with the public safety and individual rights, no person hereafter born shall be held in servitude in his state, after he is 25 years of age; the words *within this state* would then be held superfluous, as they must be in many other cases; and it would give complete effect to the object in view. Without however giving a definite opinion upon the point, there is another view of the subject, which, upon principles conceded in this case, we think conclusive.

The respondent, it has been conceded, can claim nothing by the law of comity, and nothing under the constitution of the *United States.* From the law, as settled in *Somerset's* case, that a foreigner who brings his slave into a country where slavery is not permitted, cannot hold him, it would seem to result, that upon this subject at least, an inhabitant of another state or country could claim no other or greater privileges than the inhabitants of that state or country into which he removed: of course, that where slavery was allowed to the citizen, only in a modified form, the stranger could only claim a toleration of it in him, to the extent of that modification. Any other principle would authorise an inhabitant of *Constantinople* or of the *Barbary Powers* to claim the protection of our laws in assisting him to retain his white *Christian* slaves. If then, our law per-

*Hartford,*
June, 1837.

Nancy Jackson
*v.*
Bulloch.

*Hartford,*
*June, 1837.*

Nancy Jackson
*v.*
Bulloch.

mits our citizens to enslave negroes only, it would not, for that reason, sanction the slavery of whites in one not an inhabitant; or if it allowed our citizens to hold in bondage male negroes only, no principle could be deduced from this authorising strangers among us to hold females as slaves. And if one citizen could hold no persons but those under 25 years of age as slaves, by a parity of reason, no others among us could hold them for a longer period. If our law abolishes slavery entirely, as it respects our citizens, it has not been denied, that its operation would be to prevent others from holding slaves among us. If then from regard to supposed existing rights and public safety, they have abolished it in part, or to a certain extent, among our citizens, why should not this restriction operate to the same extent that it does upon our own citizens ? If it be said, foreigners are not named, in the one case ; neither are they, in the other ; and we are unable to see why a partial prohibition shall not, so far as it extends, operate as effectually upon foreigners as a total prohibition would do.

The result, therefore, to which a majority of the court have arrived, is, that these statutes were designed to terminate slavery in *Connecticut,* and that they are sufficient for that purpose. The act of 1774 aimed a blow at the increase of slaves; that of 1784, struck at the existence of slavery. The former was intended to weaken the system ; the latter, to destroy it. The former lopped off a limb from the trunk ; the latter struck a deadly blow at the root ; and ever since it has withered and decayed ; and with the exception of here and there a dying limb, slavery has disappeared from our state, and will, in a short time, be known only in our history ; unless indeed, it is to revive and flourish, by the construction we shall now give to the statutes. To us it appears as if there was nothing in the intent of the legislature, or in the words of the act, which requires such a construction.

We feel therefore bound to say, that we know of no law of this state, under which this woman can be holden in slavery ; and therefore advise, that she be discharged.

HUNTINGTON and WAITE, Js. were of the same opinion.

BISSELL, J. This writ of *habeas corpus* was originally brought before the Chief Justice, and the questions arising upon the return have, by him, been submitted for our consideration and advice.

*Hartford,*
June, 1837.

Nancy Jackson
*v.*
Bulloch.

It is deeply to be regretted, that, in a case involving consequences of more than ordinary magnitude; affecting, as this does, not only our own institutions, but our intercourse with our sister states; the usual harmony should not prevail among the members of the court. I find myself compelled to dissent from the opinions held by a majority of my brethren ; and I feel bound, in justice to myself, to state the reasons on which my own opinion is founded.

It is admitted, by the demurrer to the return, that *Nancy Jackson,* the person brought up, on the writ of *habeas corpus,* was born in the state of *Georgia,* in 1813 ; and that by the laws of that state, she is a slave, and the property of the respondent; that he is a citizen, and settled inhabitant of the state of *Georgia,* where his domicil yet remains ; that in the year 1835, he came into this state, with a view to a temporary residence therein ; that it is, and ever since his residence here, has been, his intention soon to return to *Georgia ;* that he brought his slave *Nancy* with him into this state ; that she has ever remained in the service of his family and under his controul ; and that his intention is, to take her back with him to the place of his domicil. The simple question before us is, (as I shall attempt to shew) whether he has a right *to retain her for that purpose.*

I do not found my opinion, in this case, upon the fact, that the respondent is a citizen of a sister state, rather than a foreigner ; nor upon any principle of comity growing out of the constitution of the *United States;* although one object of the constitution undoubtedly was, to abolish alienage, and to promote a free and unembarrassed intercourse between the citizens of the different states in the union. And the principles of international law ought to be liberally expounded and applied, so as to promote and secure, as far as may be, this important object.

That these principles, which are well established and applied, as between foreign states, do, to a certain extent, recognize and enforce the law of the domicil, will not be denied. " We always import, (says Lord *Ellenborough,*) together

*Hartford,*
*June, 1837.*

Nancy Jackson
*v.*
Bulloch.

with their persons, the existing relations of foreigners as between themselves, according to the laws of their respective countries, except, indeed, where those laws clash with the rights of our own citizens here." *Potter* v. *Brown,* 5 *East,* 130. And so also in regard to personal property, *Pothier* remarks, that all things which have no locality, follow the person of the owner; and are, consequently, governed, by the law or custom, which governs his person; that is to say, by the law of the domicil. See also *Story's Conflict of Laws, p.* 52, 64.

These principles are too well known and established to require the aid of further authorities in their support; and in ordinary cases, we should certainly find no difficulty in applying them. If, for example, a citizen of *France* were to come into this state, with his son, of the age of twenty-two years, for a temporary purpose, and intending to return; should we not recognize the law of *France,* which extends the age of pupilage to twenty-five years? And should we deprive this parent of the controul and custody of his child, because by our law, the son attains to his majority at the age of twenty-one?

Now, by the laws of *Georgia,* the individual brought up, on this writ, is the slave and property of the respondent; and it is admitted, that by those laws, her condition is not affected, by her temporary residence among us. If she return with him to *Georgia,* she will still continue to be his slave and his property. Is this relation destroyed, and is this respondent divested of his rights, by the operation of our laws? Do the claims set forth on this return so far *" clash with the rights of our citizens ;"* and are they so opposed to the institutions, and the essential interests of this community, as that the law of the domicil must yield? This, as it seems to me, is the whole enquiry; and it lies within very narrow limits.

The discussion has, however, taken a wide range, and many considerations have been urged upon us, which, in my judgment, have very little to do with the case to be decided. Much has been said of the injustice and immorality of slavery; and both moral and political writers have been summoned to our bar, to bear testimony to the enormities of the system.

Those considerations might very properly be urged, and have their influence, elsewhere. They might, with propriety, and should have been addressed to our pilgrim fathers, when

they were about to introduce the system, and to bring this foul stain upon our otherwise free institutions. They may properly enough be urged upon the legislative department of the government. And I am not about to deny the propriety of urging them upon the moral sense and feelings of the community. With these topics, and with the excitement that is abroad on this subject, whether favourable or adverse to the present claim, I can have nothing to do. Sitting here to administer the law, I cannot undertake to be wiser than the laws and constitution of my country, nor purer than those great and good men, by whom they were ordained. As a citizen and as a man, I may admit the injustice and immorality of slavery ; that its tendencies are all bad ; that it is productive of evil, and of evil only. But as a jurist, I must look at that standard of morality, which the law prescribes. " Whatsoever," (says Ch. J. *Marshall*) " might be the answer of a moralist to the question, a jurist must search for its solution, in those principles of action, which are sanctioned by the usages, the national acts, and the general assent of that portion of the world, of which he considers himself a part, and to whose bar the appeal is made."

Again ; it has been urged, that slavery is opposed to the laws of nature and of God ; that its existence among us is forbidden, by our obligation to these laws ; and that they are paramount to the law of the domicil. I may be permitted to enquire here, what is the precise meaning of this argument ; and how far it is intended to be carried ? Is it meant, that the whole law of slavery is absolutely void ? And that no obligation whatever can grow out of it ? Is it to be seriously urged, that no obligation, no contract, bottomed on slavery, as a system, can be enforced in our courts of justice ? Unless the argument is to be carried this length, it is difficult to see its application to the case : and before we can be called upon to take this ground, we must be asked to denounce a system, which has prevailed among us for more than a century ; to blot out from our statute book, the various enactments, by which it has been recognized and regulated ; and to reverse the repeated decisions of this court.

Again ; it is insisted, with much apparent reliance on the objection, that if we hold this return to be sufficient, we sanction and adopt the whole law of slavery, as it exists in *Geor-*

*Hartford,*
July, 1837.

Nancy Jackson
*v.*
Bulloch.

*gia*; and that we establish their system among us, with all its odious and revolting features. I cannot so understand the law. The simple enquiry upon this demurrer, is, whether the claim of the respondent, *as stated on the return*, conflicts with our laws. It might just as well be urged, were a native of *Hindostan* to come here to reside for a season, that by allowing him to retain the custody of his infant child, we adopted the laws and the customs of *Hindostan* in regard to that relation ; and of course, must allow the parent either to sacrifice his child to his idols, or expose him to perish.

And again ; it has been urged, that if we suffer this respondent to take his slave with him to *Georgia*, she will there be subjected to all the rigours and injustice of their system. This may be true ; and we may regret that it is so : but are we, therefore, to say that she is emancipated ? The state of *Georgia*, in the exercise of her undoubted rights, as a sovereign state, has enacted laws upon this subject, which she deems essential to the security of her citizens, and the protection of their interests ; and so long as she enforces these laws, within her own jurisdiction, we surely are not to sit in judgment upon them. If, indeed, she seeks to enforce them here, and calls upon our tribunals to assist in so doing ; we may then, as we are now called upon to do, determine whether their execution here will conflict with our own laws and institutions.

I proceed, then, to enquire, whether there be anything in these, which deprives the respondent, in this case, of the custody of his slave, and prevents his taking her with him to the place of his domicil. And here I maintain, that the state of *Connecticut*, from time immemorial, has been, and to a certain extent now is, a slave-holding state. This is too clear to admit of dispute. At what time, or in what manner, slavery was first introduced ; whether by force of some statutory provision, or in accordance with the commonly received opinions of the day, that the institution was not opposed to the laws of God ; it is not easy, nor is it important, to ascertain. But as early as 1711, a statute was enacted, recognizing slavery as then existing ; and providing for the regulation of the reciprocal rights and duties of master and slave. It was then enacted, that all slaves set at liberty, by their owners, in case they come to want after they are set at liberty, shall be relieved

by such owners, their heirs, executors and administrators. This provision has been retained, in every subsequent revision of our statutes; and was re-enacted, almost in terms, at the revision of 1821. And the statute now provides in what manner slaves may be emancipated, and their owners be discharged from future liability for their support.

*Hartford,*
June, 1837.

Nancy Jackson
*v.*
Bulloch.

In the year 1750, statutes were passed still recognizing and sanctioning the relation between the owners and slaves, and regarding the latter as a class, not entitled to the ordinary privileges of citizens. They were forbidden to travel or wander out of the bounds of the town or place to which they belonged, without a ticket or pass, signed by an assistant or justice of peace, or under the hand of the master or owner. And they were also prohibited from being abroad in the night season, after nine o'clock, without special order of their masters, upon pain of being publicly whipped upon the naked body.

In 1774, it was enacted, that no indian, negro or mulatto slave should, at any time thereafter, be brought or imported into the state, by sea or land, from any place or places whatsoever, to *be disposed of, sold or left within the state :* and a penalty is inflicted upon all persons, who shall import or bring slaves into the state ; or who shall receive or purchase them, contrary to the true intent and meaning of the act. The provisions of this act are still in force ; and I shall hereafter have occasion to examine how far they are applicable to the case now before the court.

Thus far, it is most obvious, that slavery, in all its essential ingredients, existed among us, as an institution well known to, and sanctioned by, our laws. And if it here assumed a milder and more mitigated form than in many of the states, this was rather the result of public sentiment, and of a more correct state of moral feeling, than of any peculiar mildness in our legislative enactments on the subject. But if the system was less rigorous, still it was a system of absolute, unconditional servitude. Still the principle was recognized and acted upon, that one man might have a property in another; might command his services for life, without compensation ; and dispose of him, as he would of any other chattel.

No modification of the laws on this subject took place until the year 1784, when the legislature, in order, as it is expressed

in the preamble to the act, that the abolition of slavery should be effected as soon as might be consistent with the rights of individuals, and the public safety and welfare, enacted, "That no negro or mulatto, that should, after the 1st day of *March*, 1784, *be born in this state*, should be held in servitude longer than until they should arrive at the age of twenty-five years, notwithstanding the parent or mother of such child, was holden in servitude at the time of its birth ; but such child, at the age aforesaid, should be free, any law, custom, or usage to the contrary, notwithstanding." Now, nothing is more clear, than that the legislature did not intend to interfere, nor did they interfere, with the relation existing between masters and their slaves. The latter still continued to be held as property, subject to the controul of their masters ; and that numbers of them still continue so to be held, is proved by the last census of the state, taken under the act of Congress.

These views are fully sustained, by our judicial determinations. I barely refer to the authorities. *Kingsbury* v. *The Town of Tolland*, 2 *Root*, 335. *Bolton* v. *Haddam*, 2 *Root*, 517. *Windsor* v. *Hartford*, 2 *Conn. Rep.* 355. *Columbia* v. *Williams*, 3 *Conn. Rep.* 467.

In the year 1797, some of the most severe restrictions imposed upon slaves, by the act of 1750, were repealed ; and it was then enacted, that no negro or mulatto child, *born in this state*, after the 1st day of *August*, 1797, should be held in servitude longer than until he should arrive at the age of twenty-one years. At the revision of 1821, the last statute we have had on this subject, and the one now in force, was enacted : and this provides, that negro and mulatto children, *born in this state*, shall be free at the age of twenty-one, and shall not be holden in servitude, though their mothers or parents were slaves at their births." *Stat.* 428.

In the enactment of these latter statutes, the object entertained by the legislature in 1784, was still kept in view ;—and that was, to provide for the abolition of slavery, as soon as might be consistent with the *right of individuals, and the public safety and welfare.* The existing relations of society were not disturbed.

This is a brief outline of the system of slavery, as it has existed in this state, so far as I have been able to trace its history through the several statutes, that have, from time to time,

been enacted, and the judicial decisions that have been had on the subject. And in view of the whole, I must confess, that I am utterly at a loss to discover upon what principle, or in virtue of what statute, it is, that the property of the respondent in his slave has become divested.

*Hartford, June, 1837.*

*Nancy Jackson v. Bulloch.*

First, is it that slavery is opposed to the common law of this state? This claim has been gravely urged at the bar; and we have been told, that the common law of *England* is our common law; and that slavery has there been held repugnant to the principles of the common law. One would think, that a very slight glance at our statutes and our decisions, in which slavery is not merely tolerated, but sanctioned and regulated, would prove a very satisfactory answer to this claim; and show, most conclusively, that the common law of *England*, on this subject, never had any application here. And yet *Somerset's* case, and the more recent case of *Forbes* v. *Cochrane,* have been cited, as though we were at liberty to adopt the doctrine of those cases, and to hold the language, which was there held. But is it so? And are we prepared to hold, that the moment a slave touches our soil, he becomes free? And to say, that the air of *Connecticut* is too pure for a slave to breathe? Why, we know, there has not been a moment for more than a century, in which such language could be held, without conveying a bitter sarcasm, both upon our laws and our practice. I yield to no man in attachment to the laws and institutions of my native state. And I will unite with the foremost in praise of those wise and salutary measures, under the influence of which, this blot upon our escutcheon is fast disappearing. But it can be of no avail to attempt to make ourselves purer in this matter than we really are; or to reprobate in others a practice, the blood of which is yet to be found on our own skirts.

Secondly, it has been insisted, that slavery has, here, become extinct, by the adoption of our state constitution.

That part of the constitution, upon which most reliance has been placed, is the 1st section of the declaration of rights; which is in these words: " All men, when they form a social compact, are equal in rights ;" and that "no man or set of men are entitled to exclusive public emoluments, or privileges, from the community."

To whom does the term " *all men,*" as here used, extend;

*Hartford,*
*June, 1837.*

Nancy Jackson
*v.*
Bulloch.

and whom does it embrace? We might safely leave this section to be its own interpreter upon the question. It is *all men, when they form a social compact;* evidently applying to those, and to those only, who are parties to the compact. But slaves are not, and are not capable of being, parties to such a compact. It is one of the bitterest evils of their condition, that they have no will of their own. Their volitions can hardly be said to be free. But the second section declares, that all political power is inherent in the people; and all free governments are founded on their authority, and instituted for their benefit; and that they have, at all times, a right to alter the form of government, &c. Now, the term *"people"* is hardly less comprehensive than the *"all men"* in the first section. But are we to understand the framers of the constitution as asserting, that any political power is inherent in slaves; that the government is founded on their authority; and that they have a right to alter it? A satisfactory solution of these enquiries, is to be found in a subsequent part of the same instrument, which confines the right of suffrage to *free, white citizens.* It may not be improper, in this place, to advert, for a moment, to the charter of *Charles* II. which, for a century and a half, was *truly* the charter of our political rights and civil liberties; and under which slavery was introduced, and, as we have seen, received the repeated sanction of our laws; and yet the charter declares, that all the king's subjects here, shall have and enjoy all the liberties and immunities of natural born subjects, as if they were born in the realm of *England.* These expressions in our state constitution, in the charter of *Charles* II. and equivalent expressions in the declaration of independence, most evidently were not intended to embrace slaves, but were applied to *freemen,* and to them only.

The 10th section of the bill of rights has been referred to, as having a bearing on the question. This section declares, that " no person shall be arrested, *detained* or punished, except in cases clearly warranted by law." Now, nothing can be more obvious, than that the argument drawn from this part of the constitution, takes for granted the very thing to be proved. The question we are endeavouring to settle, is, whether the detention of the individual claimed, is warranted by law.

Reference has also been had to the constitution of *Massachusetts,* and to the recent decision under it, as applicable to

*Hartford,*
*June, 1837.*

Nancy Jackson
*v.*
Bulloch.

the case. I need only advert to the constitution of that state to prove, that its language upon this subject is very explicit ; and that there is very little resemblance between that, and the constitution of this state. By *that* it is declared, that "all men are born free and equal, and have certain natural, essential and unalienable rights, among which may be reckoned the right of defending and enjoying their lives and their liberties." We have seen, that by our constitution, even free blacks are excluded from the right of suffrage ; the most important of political rights. But aside from the language of the constitution, there are other considerations, which, in my judgment, show conclusively, that it has nothing to do with the subject of slavery. In the year 1821, our statutes were revised ; and with the constitution then recently adopted, before them, and acting under its sanctions, the legislature re-enacted the then existing laws on this subject ; and those laws yet remain in full force upon the pages of our statute book.

In the year 1831, the case of *East-Hartford* v. *Pitkin,* 8 *Conn. Rep.* 393. was decided, by this court. And although there was a difference of opinion upon one point in the case, yet the relation between the master and his slave was fully recognized.

The present Chief Justice, in pronouncing an opinion, in which I had the honour to concur with him, says : "*Flora* was the *slave and personal property* of *Elisha Pitkin,* at the time of his death." And he further remarks : "I regret that I cannot *authoritatively* adopt the language of an *English* judge—'A negro is a man ; and a man may be the owner, but cannot be the subject, of property.' Thus, the constitution is not only its own interpreter, but it has received both a legislative and a judicial exposition ; all of which we are now called upon to sweep away, upon the strength of a very general expression, in the declaration of rights.

If, then, the claims of the respondent are repugnant, neither to our unwritten law, nor to our constitution, it only remains, that we enquire whether they conflict with any of the statutes to which I have adverted.

It has been supposed, that the case falls within the spirit and meaning of the acts providing for the gradual abolition of slavery. These statutes, as we have seen, are confined, *in terms,* to persons *born in this state.* And I confess, I hardly know

*Hartford,*
*June, 1837.*

Nancy Jackson
*v.*
Bulloch.

upon what principle of interpretation it is, that we are called upon to extend the provisions of these acts to persons *born else-where*. Is it to carry into effect the general intention of the legislature? That the great and leading object was, entirely to abolish slavery in this state, I most readily admit. But still, regard was had to individual interests, as well as the public welfare. The legislature did not intend to break in upon the rights of our own citizens, or upon those of the citizens of other states. And having provided, that no slaves should be brought into the state, to be disposed of, left or sold within the same; and that persons thereafter born *in the state*, should be free; they doubtless supposed, they had done all that could consistently be done. And it never could have been their intention, as I maintain, to extend these acts to persons born *out of the state*. Since the act of 1784, our statutes have passed through three deliberate revisions; and in all, the provision in question has been confined, as at the first, to persons born in the state. In the mean time, it could not but be well known, that our *Southern* brethren were in the constant practice of visiting us, as the respondent has done, bringing their slaves with them, and taking them back to their own states, whenever it suited their convenience. And if this had been felt to be an evil, to militate against the spirit of our laws, would not the legislature have applied the remedy? And would they have thrown upon courts of justice the invidious task of torturing the language of the act from its plain and unequivocal meaning, in order to carry out their intention? It is more than half a century since these emancipating acts have been in force; and never, I believe, until the present experiment, have they been supposed to apply to a case like this. Now, I confess, I do not feel at liberty, and especially, in the face of this practical construction, to say, that when the legislature speak of persons born *in this state*, they really mean persons born somewhere else.

It is, however, said, that upon the construction contended for, we allow to citizens of other states, a privilege, which we deny to our own. I do not admit this conclusion. We allow to our citizens the right of holding *their own slaves;* and why should we deny to citizens of other states, the right of holding *theirs?* It is true, that persons born *in this state*, after the first of *March*, 1784, are not, and never were, slaves. Nobody is di-

vested of a property in them ; for they never were the subjects *Hartford,* of property.    But not so in this case.    The individual claimed June, 1837. was the property of the respondent.    Has he become divested Nancy Jackson of it ?    And if so, by what law ?

*v.*

Bulloch.

But it is said, that this view of the case will sanction the introduction here of slaves, born in other states ; that our own citizens may bring and hold them here, with impunity ; and especially, that the citizens of the slave-holding states may come here and acquire a domicil, bringing their slaves along with them, and holding them in perpetual servitude, contrary to the whole scope and spirit of our laws.    Neither can I admit the correctness of this conclusion : and if it followed—if in this respect, there be a defect in our legislation,—I submit that the correction does not appertain to this branch of the government. Our concern is with the laws as they are ; and if they are not so framed, as upon a fair construction, to carry out the whole intent of the makers, it were better that they should be corrected, in the proper place, than that courts of justice should resort to novel modes of interpretation, for the purpose of supplying the deficiency.    But were I called upon to decide the case put, I should say, that they fell much more clearly within the equity of the 4th and 5th sections of the statute, than of the one now under consideration.    It will, however, be sufficient to decide such a case, when it shall arise.    Of this, however, there would seem to be little danger ; as neither our own citizens, nor those of other states have ever supposed, that they were at liberty to bring slaves here, to be held in perpetual servitude.

Again ; it has been objected, and much reliance is placed upon the objection, that the facts set forth in the return show, that the slave *Nancy* was brought here *to be left,* and has been *left,* within the meaning of the 4th section of the statute. That section I will again advert to.    It is in these words : " No indian, negro or mulatto slave, shall be brought or imported into this state, by sea or by land, from any place whatever, to be disposed of, left or sold within the same."    I have already adverted to the facts stated in the return, and they seem to me to furnish quite as strong evidence, that this slave was brought here to be *sold* or *disposed of,* as that she was brought here *to be left.*    " To leave," says Dr. *Webster,* (and with him agrees every *English* lexicographer,) signifies " *to withdraw* or depart from," " to forsake," " desert, abandon," " to suffer to re

*Hartford,*
*June, 1837.*

Nancy Jackson
*v.*
Bulloch.

main," " not to take or remove." Now, this slave has ever been in the service of the respondent's family, and under his protection and controul. He has not " *withdrawn from her.*" She has neither been *forsaken, deserted* nor *abandoned ;* and so far from suffering her to remain, he states his intention to be to take her with him to his domicil and hers. Now, is here any evidence that this slave was brought here *to be left,* within either the grammatical or popular meaning of the term ? The respondent has come into this state, for the purpose of educating the younger members of his family ; and when that object is accomplished, he means to return with them to their common home.

Would any man acquainted with the facts say, that he had brought his family here *to be left ?* And would not this be a perversion of language ? I, however, understand it to be claimed, that to leave a slave in the state, within the meaning of the act, it is not necessary that he should be abandoned, but that it is sufficient if he *stop here with his master :* and that *to be left,* is used in the statute, only in contradistinction to a mere *transit* or passage through the state : that in the one case, the rights of the master are preserved, and in the other lost, although the place of the domicil be the object in both cases. I am unable to feel the force of this distinction ; or to see why it is, that in the one case, we are to have regard to the law of the domicil, and suffer it to govern, and not in the other. Can any thing depend on mere length of stay, so long as the domicil is unchanged, and the *animus revertendi, bona fide* remains ? We are, undoubtedly, to apply the same rules, in giving a construction to this statute, which govern in other cases ; and there is no principle more familiar, than that words and phrases, the meaning of which has been ascertained in a statute, are, when used in a subsequent statute, to be understood in the same sense ; and the more especially, if the latter statute be *in pari materia.*

Now, the precise form of expression, under consideration, was introduced into our statutes as early as the year 1750. In an act concerning indian, negro, and mulatto children, *and slaves,* it was, among other things, enacted, " That all indians, male or female, of what age soever, brought into this colony, by sea or land, from any place whatsoever, *to be disposed of, left or sold* within this colony, shall be forfeited to the treasury

of this colony, and may be seized and taken accordingly ; unless the person or persons importing or bringing in such indian, or indians, shall give security to some naval officer in this colony, of fifty pounds *per* head, to transport or carry out the same again, within the space of one month next after their coming, not to be returned back to this colony." A sufficiently intelligible definition is here given of the term *" to be left ;"* and the legislature seem to have understood, that *"to leave in the state,"* did not mean *to carry out of it.* The objects of this enactment and the mischiefs to be remedied by it, are very explicitly stated in the preamble,—and were, " for preventing disorders and insolences from being committed by indians brought from other plantations, and for preventing charges coming upon towns, by negro, indian and mulatto servants, *and slaves,* coming *and being made free."* Now, why should the legislature have retained the precise form of expression, as they have done through every succeeding revision of the statutes, if they meant to affix to it a different meaning ? And especially, if they meant to affix a meaning not only different from, but the opposite of, that which originally obtained ?

The return shows, that it is the intention of this master to take his slave out of the state ; and we are asked not so to construe the statute, not so to administer the law, as to sustain, but so as to defeat that intention ; not so as to oblige him to protect, but so as to compel him to abandon his slave ; not so as to insure her removal from, but her permanent residence in this state ; not so as to relieve the community from the burthen of her support, but almost entirely to cast it upon them. There would almost seem to be a magic in this word *" left,"* that compels the court to be at cross-purposes with the framers of the act, and at the same time, to hold out an intimation to our *Southern* neighbours to visit us with their decrepid and worn out slaves, and, by the aid of our philanthropists, to fix them upon us, as a part of our settled population.

The views I have expressed, in regard to the construction of the statute, are, I think, corroborated, by the 18th section of the statute concerning Crimes and Punishments. That section forbids, upon pain of confinement in the state prison, the kidnapping or forcibly carrying out of this state, any free person, or person entitled to freedom, with an intention to have him *held in slavery* or servitude, against his will. But it is

provided, that nothing in the section shall operate to prevent persons coming into this state, for *the purpose of temporary residence, or passing through the same, from carrying with them their servants ;* clearly recognizing the right of such persons to take their servants to the place of their domicil, *there to be held in slavery,* and making no distinction between *a temporary residence,* and *a passing through the state.*

The statute in question, inflicts a penalty of 350 dollars upon any person who shall violate its provisions. Now, were the same disinterested regard for the law, which has originated this proceeding, to insist upon the punishment also, are we prepared to carry out the construction now adopted ? And, upon the admitted facts in the case, and in view of the familiar rule, that a penal statute is to be construed strictly, are we prepared to inflict the penalty upon the respondent ? I see not how this consequence can be consistently avoided ; and the more especially, as by our decision, we compel him to leave his slave in the state, and thus to furnish the most decisive evidence, that she was brought here *to be left.*

It was very properly contended, at the bar, that by the energy of our laws, this slave became free, the moment she touched the soil of *Connecticut.* This claim has, at least, the merit of consistency, and I can feel its force. But the argument here, does not proceed upon any such ground. It distinctly admits, that when the slave *Nancy* came into this state, she was the slave and property of the respondent; and that had she merely passed with him through the state, she might have remained his slave and property still ; but that *by stopping with him,* in the state, she has, by the operation of this statute, become free. How this has been accomplished; at what time this process of emancipation commenced, and when it was consummated ; I have not been able, very clearly, to comprehend.

If the respondent has brought this slave here *to be left,* in violation of the statute, I can readily see the propriety of visiting him with the penalty, which the statute prescribes ; but I am not able to see upon what authority it is, that we superadd to this, a forfeiture of his property.

I ought, perhaps, to notice the case of *The Commonwealth v. Aves,* recently decided, by the supreme court of *Massachu-*

setts; and the case of *Lunsford* v. *Coquillon*, 14 *Martin's Rep.* 465. which were cited at the bar.    The decision in the former case, proceeded upon the ground, that slavery had, long since, been abolished in *Massachusetts ;* and that the claim under the law of the domicil was repugnant to her laws, inconsistent with her policy and her fundamental principles; and that the slave became free upon coming into the state.    I have endeavoured to show, that such is not the case here ; and, I do not understand, that a majority of the court rest their decision upon this ground.

In *Lunsford* v. *Coquillon,* the master had abandoned his domicil, and had removed, with his slaves, into a state where it was declared that slavery never should exist ; and it was held, that by a residence there, for ever so short a time, the slaves became free.    With this decision I surely can have no controversy ; it was undoubtedly correct ; but it has manifestly no application to the case now before us.

Upon the best consideration I have been able to give to this case, I am constrained to say, that in my judgment, the return is sufficient ; and that the demurrer ought to be overruled.    At the same time, I must be permitted to say, that it is a source of gratification both to my learned brother who concurs with me, and to myself, to know, that if our views on this subject are erroneous, their effect will not be, unjustly to deprive a fellow-being of her liberty.

CHURCH, J. concurred in this opinion.

Return insufficient.