### STATE v. PIONEER PRESS COMPANY.[1]

February 21, 1907.

Nos. 14,997—(22).

**Liberty of the Press—Act Constitutional.**

Appellant was indicted for publishing, contrary to the provisions of chapter 20, p. 66, Laws 1889, in its newspaper, an account of the execution of a criminal convicted of murder.

*Held*, the act entitled "An act providing the mode of inflicting the punishment of death, the manner in which the same shall be carried into effect, and declaring a violation of any of the provisions of this act to be a misdemeanor," complies with the requirements of section 27, art. 4, of the constitution with respect to the title, and is not in conflict with section 3, art. 1, of the constitution, which preserves the liberty of the press, nor with section 6, art. 1, which guaranties to the accused in criminal prosecutions the right to a speedy and public trial.

The defendant was indicted for publishing an account of an execution. The district court for Ramsey county, Bunn, J., overruled a demurrer to the indictment and at the request of defendant certified to the supreme court the questions whether chapter 20, Laws 1889, violated section 1 of art. 1 of the state constitution or either of the other clauses of that instrument mentioned in the syllabus, or section 1 of art. 14 of the federal constitution, and whether the facts stated in the indictment constituted a public offense. Affirmed.

*T. R. Kane* and *O. H. O'Neill,* for the State.

*Frederick G. Ingersoll, Charles A. Hart, Munn & Thygeson,* and *J. R. Hickey,* for defendant.

[1] Reported in 110 N. W. 867.

LEWIS, J.

Appellant was indicted for publishing an account of the execution of William Williams, in violation of the provisions of chapter 20, p. 66,. Laws 1889.

The act requires that executions take place before the hour of sunrise on the day designated, in an inclosure from which the public are excluded, and in the presence of the following persons only:

> Sec. 5. Besides the sheriff and his assistants, the following persons may be present at the execution, but none other: The clergyman, or priest, in attendance upon the prisoner, and such other persons as the prisoner may designate, not exceeding three in number, a physician or surgeon, to be selected by the sheriff, and such other persons as the sheriff may designate, not exceeding six in number, but no person so admitted shall be a newspaper reporter or representative. No account of the details of such execution beyond the statement of the fact that such convict was on the day in question duly executed according to law, shall be published in any newspaper.

Briefly stated, the indictment charged that appellant, on February 13, 1906, did print and publish the details of the execution by setting out the movements of the officers and the convict from the time they left the jail until they reached the scaffold, the last statement of the prisoner, the manner in which he was prepared for execution, the adjustment of the noose and the black cap, the springing of the trap, the pronouncement of death, the removal of the body to the undertaker's rooms, and the autopsy performed under the supervision of the coroner. The indictment was demurred to upon the ground that the facts. stated therein do not constitute a public offense. The demurrer was overruled by the trial court, and, in view of their importance, certain questions were certified to this court.

1. Chapter 20, p. 66, Laws 1889, is not in violation of section 27, art. 4, of the constitution, which requires that no law shall embrace more than one subject, which shall be expressed in its title. The title of the act reads:

> An act providing the mode of inflicting the punishment of death, the manner in which the same shall be carried into ef-

fect, and declaring a violation of any of the provisions of this act to be a misdemeanor.

It is asserted on behalf of appellant that there is nothing in the title which reasonably suggests that the act contains a provision making it a criminal offense for a newspaper to publish an account of an execution; that the title is restrictive, being limited solely to the manner of inflicting the punishment of death, and the means of carrying such punishment into effect. It is true that the constitution has made the title of an act the exclusive index to the legislative intent, and that the courts cannot enlarge the scope of the title; but in our judgment the provision in the body of this act with reference to the publication of facts by a newspaper concerning an execution is fairly and reasonably embraced in the general heading of the title. The evident purpose of the act was to surround the execution of criminals with as much secrecy as possible, in order to avoid exciting an unwholesome effect on the public mind. For that reason it must take place before dawn, while the masses are at rest, and within an inclosure, so as to debar the morbidly curious. The number of witnesses is limited to the minimum, and, to give further effect to the purpose of avoiding publicity, newspaper reporters and representatives of the press are prohibited, and the publication of the event is limited to a mere statement of the fact that the execution took place. Publication of the facts in a newspaper would tend to offset all the benefits of secrecy provided for, and therefore the restriction as to publication has direct relation to and connection with the other matters embraced within the act. The title does not set out the whole of the statute, nor is it essential that it should; but it does not serve as a cloak for legislating upon dissimilar matters, or subjects not naturally connected with the one embraced in the title, as suggested in Winters v. City of Duluth, 82 Minn. 127, 84 N. W. 788.

A reasonable and liberal construction of the constitutional inhibition is the one accepted by this court in many decisions, and it is sufficient if the title is fairly suggestive of the enactments which follow. City of Duluth v. Abrahamson, 96 Minn. 39, 104 N. W. 682; Merchants Nat. Bank of St. Paul v. City of East Grand Forks, 94 Minn. 246, 102 N. W. 703; and many other cases therein cited.

2. It is again submitted that the act violates the provision of section 3, art. 1, of the constitution:

> The liberty of the press shall forever remain inviolate, and all persons may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of such right.

Mr. Cooley traces the history of this provision, and shows that, although it was directly aimed at the removal of previous restraints upon public speech and freedom of the press, yet it does not follow that there is a constitutional right to publish every fact or statement which may be true. "We understand liberty of speech and of the press to imply, not only liberty to publish, but complete immunity from legal censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords." Const. Lim. (7th Ed.) 605. But he also states: "If the nature of the case is such as to make it improper that the proceedings should be spread before the public, because of their immoral tendency, or of the blasphemous or indecent character of the evidence exhibited, the publication, though impartial and full, will be a public offense, punishable accordingly." Page 637. Chancellor Kent defined the liberty of the press under the constitution as follows: "The liberty of the press consists in the right to publish with impunity truth with good motives and for justifiable ends, whether it respects government, magistracy, or individuals." (People v. Croswell, 3 John. Cas. 393.) Mr. Story states that the constitutional prohibition "places no restraint upon the power of the legislature to punish for the publication of matter which is injurious to society according to the standard of the common law. It does not deprive the state of the primary right of self-preservation."

Appellant, citing State v. Shepherd, 177 Mo. 205, 76 S. W. 79, argues that there are no constitutional limitations upon the liberty of the press, unless the subject-matter be blasphemous, obscene, seditious, or scandalous in its character. This is altogether too restricted a view. The principle is the same, whether the subject-matter of the publication is distinctly blasphemous, seditious, or scandalous, or of such character as naturally tends to excite the public mind and thus indirectly affect the public good. If the constitutional provision has

reference to restricting the publication by newspapers of unwholesome matter, as in State v. McKee, 73 Conn. 18, 46 Atl. 409, 49 L. R. A. 542, 84 Am. St. 124, and In re Banks, 56 Kan. 242, 42 Pac. 693, or the use of the United States mails for the distribution of obscene literature, as in United States v. Harmon (D. C.) 45 Fed. 414, or the publishing of anarchistic doctrines, as in People v. Most (Sup.) 75 N. Y. Supp. 591, upon the ground that it is in the interest of public morals, then for the same reason the right of restriction applies to publishing details of criminal executions.

The article in question is moderate, and does not resort to any unusual language, or exhibit cartoons for the purpose of emphasizing the horrors of executing the death penalty; but if, in the opinion of the legislature, it is detrimental to public morals to publish anything more than the mere fact that the execution has taken place, then, under the authorities and upon principle, the appellant was not deprived of any constitutional right in being so limited.

3. Section 6, art. 1, of the constitution, which requires that in all criminal prosecutions the accused shall enjoy the right of a speedy and public trial, has no application to this question. "Public trial" means trial by jury, perhaps including the rendition of judgment; but, after the accused is convicted and sentenced, the trial is over. In Holden v. Minnesota, 137 U. S. 491, 11 Sup. Ct. 143, 34 L. Ed. 734, in considering the provisions of chapter 20, p. 66, Laws 1889, the court say: "Whether a convict sentenced to death shall be executed before or after sunrise, or within or without the walls of the jail, or within or outside of some other enclosure, and whether the enclosure within which he is executed shall be higher than the gallows, thus excluding the view of persons outside, are regulations that do not affect his substantial rights. The same observation may be made touching the restriction in section 5 as to the number and character of those who may witness the execution and the exclusion altogether of reporters or representatives of newspapers. These are regulations which the legislature, in its wisdom and for the public good, could legally prescribe in respect to executions occurring after the passage of the act, and cannot, even when applied to offenses previously committed, be regarded as ex post facto within the meaning of the constitution."

Although the court then had under consideration whether certain provisions were ex post facto, the language applies also with reference to the constitutional restrictions referred to. The extent of the limitation must be left to the wisdom of the legislature, and in this instance we find no infringement upon any rights guarantied by the constitution.

Affirmed.