STATE, Plaintiff in error, vs. PIERCE, Defendant in error.

*May 27—June 13, 1916.*

*Constitutional law: Freedom of speech: Abridgment: Corrupt Practices Act: Validity.*

1. By sec. 12.05, Stats. 1915, a mere private citizen, not a candidate or member of a personal or party committee, residing in one county, was forbidden to spend money in another county in investigating the governmental, political, and financial affairs of the state and communicating the results of his investigations to the electors of the state generally, for the purpose of influencing the voting at a general election.

2. In forbidding such acts said sec. 12.05 contravenes sec. 3, art. I, Const., which provides that "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press."

3. Said sec. 12.05 not having been the inducement to or the compensation for the remainder of the Corrupt Practices Act, its invalidity does not affect the validity of the other parts of the act.
    SIEBECKER and KERWIN, JJ., dissent.

ERROR to review an order of the municipal court of Dane county: JOHN C. FEHLANDT, Judge.   *Affirmed.*

The state brings this writ of error to reverse an order quashing an indictment for violation of the so-called "Corrupt Practices Act," being ch. 650 of the Laws of 1911 (now ch. 12, Stats. 1915).

This law is intended to prevent the profuse and corrupt expenditure of money during political campaigns as well as at elections or primaries.   The first section of the act (sec. 12.01) contains definitions of certain terms used in the act and declares, among other things, that an act shall be deemed to have been done for "political purposes" when it is "of a nature, is done with the intent, or is done in such a way, as to influence or tend to influence, directly or indirectly, voting at any election or primary."   Sec. 12.02 prohibits the knowing receipt of any money, property, or thing of value, or promise or pledge thereof, constituting a disbursement for political purposes contrary to law.   Sec. 12.03 prohibits expenditures for political purposes by candidates except through a party committee or through his personal campaign committee.   Sec. 12.04 provides for the appointment by a candidate of a personal campaign committee.   Sec. 12.05, for violation of which this prosecution is brought, provides as follows:

"12.05   *Disbursements by persons other than candidates.* No person or group of persons, other than the candidate or his personal campaign committee or a party committee, shall make any disbursement for political purposes otherwise than through a personal campaign committee or a party committee, except that expenses incurred for rent of hall or other rooms, for hiring speakers, for printing, for postage, for telegraphing or telephoning, for advertising, for distributing printed matter, for clerical assistance and for hotel and traveling expenses, may be contributed and paid by a person or group of persons residing within the county where such expenses are incurred; and except that a speaker may pay his actual traveling expenses in going to and from meetings addressed by him."

Sec. 12.06 enumerates the political purposes for which a candidate may make disbursements. Sec. 12.07 enumerates the political purposes for which a party committee or personal campaign committee may make disbursements.

The act contains other sections limiting the amounts of expenditures by candidates, requiring the filing of accounts of receipts and disbursements both by candidates and committees, regulating the solicitation of contributions and the publication of political advertisements, and prescribing other limitations on the political activities of candidates and committees which are not deemed necessary to set forth at length.

The indictment contains four counts, the first charging a violation of sec. 12.05 by the making of unlawful expenditures for political purposes in the campaign preceding the primary election held September 1, 1914; the other counts charging like violations of the same section in the campaign preceding the general election in November, 1914, the second charging the expenditure of $150 August 27, 1914, the third charging the expenditure of $100 October 31, 1914, the fourth charging the expenditure of $1,000 between September 2 and November 3, 1914.

The counts are identical in language so far as the essential allegations are concerned, and the gist of each is that the defendant, being a citizen and resident of Rock county' and not a candidate or member of a personal or party committee, · unlawfully made the disbursements named for political purposes in the county of Dane, otherwise than through any personal or campaign committee and otherwise than as a speaker coming to and from meetings addressed by him, "said disbursements being made, ordered, directed, and caused to be made by said *Charles E. Pierce* in and about the collecting and gathering of facts and information concerning the political, governmental, and financial affairs of the government and administration of the state of Wisconsin and the public institutions of said state and its governmental departments, and communicating such information and facts not to or for

any political party in said state, but generally to the electors and taxpayers thereof, with the intent and for the purpose of influencing the voting at the general election held in said county of Dane and throughout the state of Wisconsin."

The *Attorney General, E. E. Brossard,* assistant attorney general, and *Harry Saulhoff,* district attorney, for the plaintiff in error.

For the defendant in error there were separate briefs by *Jeffris, Mouat, Oestreich & Avery,* attorneys, with *J. M. Clancey* and *T. C. Richmond,* of counsel; by *J. M. Clancey,* attorney, with *T. C. Richmond* and *O. A. Oestreich,* of counsel; and by *T. C. Richmond,* attorney, with *J. M. Clancey* and *Otto Oestreich,* of counsel; and the cause was argued orally by *Mr. O. A. Oestreich, Mr. Clancey, Mr. John B. Sanborn,* and *Mr. Richmond.*

WINSLOW, C. J.    The indictment charges that *Mr. Pierce,* being a mere private citizen residing in Rock county and not a candidate or committeeman, spent money in Dane county in investigating the governmental, political, and financial affairs of the state and communicating the results of his investigations to the electors of the state generally, for the purpose of influencing the voting at the approaching election in Dane county.    The communication must, of course, have been by word of mouth or by the circulation of printed matter.

These acts are said to be criminal because of the provisions of sec. 12.05 of the Corrupt Practices Act, which is quoted at length in the statement of facts.

The suggestion that these acts constitute crime is somewhat startling, but the state points to the fifth section of the Corrupt Practices Act (sec. 12.05, Stats. 1915), and upon consideration of this section it seems clear that it forbids such acts as are here alleged.    The only question remaining, therefore, is the question whether the constitution permits such acts as are here alleged to be prohibited.

Freedom of speech and freedom of the press have always been supposed to be the very corner-stones of Anglo-Saxon democratic institutions. All of our state constitutions, as well as the federal constitution, expressly preserve these rights. The constitution of Wisconsin declares (sec. 3, art. I), "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, *and no laws shall be passed to restrain or abridge the liberty of speech or of the press."*

This provision is somewhat more definite and sweeping than is contained in some of the constitutions. It declares that the freedom extends to "all subjects" and expressly prohibits the restraint or *abridgment* of that freedom. The ordinary meaning of the word *abridge* is to diminish or to lessen but not to cut off entirely.

The federal constitution (amendm. I) provides that "Congress shall make no law . . . abridging the freedom of speech or of the press."

The question presented is whether sec. 12.05 restrains or abridges the liberty of the citizen to freely speak and "publish his sentiments on all subjects."

We think there is no doubt that it does do so. Under its terms a man or body of men who are honestly convinced of the necessity of a change of policy in the state government commit a crime if they spend any money in another county than their own in bringing their views to the notice of the voters of such other county. There is really but one exception to this, and that is that a public speaker may pay his traveling expenses in going to and from his own meetings, but even he may not hire a hall in which to make his speech.

If this be not an abridgment of freedom of speech it would be difficult to imagine what would be. Under such a law no pioneer in any reform which depends for its success on a change in the law could leave his own county and communicate his sentiments at his own expense to his fellow citizens of other counties without committing a crime. Under such

laws no great propaganda for better laws and better political conditions which has not been formally taken up by a political party can ever be carried on, and the reformer whose eye kindles with the dawning light of a better day must be content to confine his personal activities to the inhabitants of his own small bailiwick. Almost every forward step in political and governmental affairs comes as the result of long agitation and discussion in the press, on the rostrum, and in the open forum of personal contact. This agitation and discussion often goes on for years before the idea is formally indorsed by any party. Yet it will generally be the case that during this period there will be individual candidates in one party or the other, or both, who favor the new thought. Now this law means that in such a situation no man or group of men can do a stroke of political work involving expense in any other county than their own, however legitimate and praiseworthy be the means which are used. No political committee will take up the work for the very good reason that the party organization has not indorsed the doctrine.

There are times also when devoted citizens firmly believe that no organized political party stands for the right or deserves support and that an independent candidacy is necessary. Can it be that under such circumstances these citizens can be wholly deprived of the right to go to any part of the state at their own expense, collect information on the subject, and endeavor by word of mouth or by the distribution of printed matter to put the issue as they see it before such fellow voters who are not residents of their own county?

We are very clearly of opinion that this question must be answered in the negative.

*Mr. Pierce,* according to the indictment, did this thing. He, being a resident of Rock county, spent money in Dane county in gathering facts concerning governmental affairs and in communicating those facts to the people of the state at large with the intent of influencing the voting at the ap-

proaching election. This cannot be made a criminal act while the constitutional guarantees of freedom of speech and freedom of the press remain as they now are.

We are by no means unmindful of the high and admirable purposes which inspired the authors of the Corrupt Practices Act. There is no member of this bench who is not in the fullest sympathy with any legislation which will tend to reduce to an absolute minimum the danger of corruption and coercion during political campaigns; but when such a law goes beyond regulation and absolutely prohibits that which the constitution expressly protects, the court can do nothing but say so.

This does not mean that the Corrupt Practices Act is invalid as a whole. We are now concerned with sec. 12.05 alone. We feel obliged to say that so far as it prohibits the doing of such acts as are charged in this indictment it violates the constitutional guarantees of freedom of speech and freedom of the press. We go no further. This section was certainly not the inducement to or the compensation for the balance of the law; in other words, we are well assured that the legislature would not have rejected the entire law had they realized that this section abridges the freedom of speech and freedom of the press in violation of the constitutional guarantees. The remaining sections of the law therefore are unaffected by this decision.

*By the Court.*—Order affirmed, and action remanded with directions to dismiss the same.

The following opinion was filed July 17, 1916:

SIEBECKER, J. (*dissenting*). The decision of the court approves the legislative propriety of enacting laws to prevent corrupt practices in elections in order to preserve the purity of the ballot. The American Congress, the English Parliament, and our state legislatures have exerted their legislative

powers for the accomplishment of this object by enacting such laws, some of which were enacted prior to the adoption of our state constitution.    By these laws the expenditure of money in elections is attempted to be so regulated as to prevent the abuse and corruption of the elective franchise.    The leading features of the acts are restrictions on contributions and expenditures, publicity thereof, and the imposition of penalties for violation of the prescribed regulations.    The court holds that the provisions of sec. 12.05, Stats. 1915, of our act on this subject are invalid because they improperly "restrain or abridge the liberty of the citizen to freely speak and publish his sentiments on all subjects" as guaranteed by sec. 3, art. I, of the state constitution.    The terms of sec. 12.05, Stats. 1915, are not, in my opinion, an invalid restraint or abridgment of these rights, in the light of an urgent necessity to regulate the mischievous expenditures of money in elections.    It is important to observe that the statute does not regulate the expenditures of money by persons in their political activities, or in promulgating their sentiments and convictions on any subject or any policy of government disassociated from and independent of any activity of influencing voters in an election, and also that no person is precluded from participating as a speaker in political campaigning in elections and speaking. his sentiments freely, except that when a person so participates as a speaker in an election campaign to influence voters he is required to file statements of his expenditures as such a speaker, or that he carry on his work at the expense of a party committee, a personal campaign committee, or a local county agency, who are required to file and make public all disbursements incurred by them for political purposes.    Manifestly these regulations of carrying on political campaigns and requiring all persons engaged in them to comply with the provisions of this law were enacted for the purpose of controlling the expenditure of money in elections—an object clearly within the legislative

power.    The act also permits the widest freedom to all per-
sons and groups of persons to promote and agitate for any
cause by the press and print through the mails at the place
of their residence and thence throughout the state.    This
shows that the freedom of speech and press is wholly unaf-
fected by the provisions of this act and is as unconfined as
ever as to all matters other than campaigning for votes in an
election, and in such campaigns all persons have the unre-
stricted liberty to speak throughout the state as they please
and employ the mails of their counties and thence through-
out the state to publish their sentiments and expound their
doctrines, policies, and reforms concerning any cause.    A
very broad and unrestricted field for activity is thus avail-
able to every publicist, speaker, reformer, or any body of
men honestly concerned with the necessity of bringing their
views to the notice of voters of the state.    I am unable to
perceive how the requirements of this law, to give an account
of the disbursements connected with such activities and to
carry them on through the committees and local county
groups in cases of political agitation, for the purpose of en-
abling the state to prevent corruption in elections, can be
considered an invasion of the freedom of speech or press.
Reasonable regulations to guard the ballot are necessary to
prevent unbridled license in the exercise of these fundamen-
tal rights in order to maintain a government of laws.    As
above indicated, corrupt practices acts are enacted to remedy
these evils, and the right of free speech and press does not
imply that its inviolability is such that it can do no wrong.
Indulgence of it is always conditioned on the proposition
that its exercise does not subvert the government and is "lim-
ited, but not abridged, by laws passed in the exercise of the
police power, for the protection of the moral health of the
community."    Black, Const. Law (3d ed.) p. 653; *State ex
rel. Runge v. Anderson,* 100 Wis. 523, 76 N. W. 482; *State
ex rel. Nordin v. Erickson,* 119 Minn. 152, 137 N. W. 385;

*State v. Pioneer Press Co.* 100 Minn. 173, 110 N. W. 867.
The legislative provisions of sec. 12.05 are directed at the
evils in elections and seek to correct them by limiting con-
tributions and expenditures of money and by requiring all
persons engaged in political campaigning to carry on their
activities through the prescribed agencies of committees and
local groups.    To accomplish these purposes the legislature
found it necessary and expedient to subject the citizen to
these methods of campaigning, which in some measure oper-
ate to confine the rights of the freedom of speech and press
in elections to the prescribed manner of exercising them.
But such restrictions to secure the public welfare are implied
in the very language of sec. 3, art. I, of our constitution,
"Every person may freely speak, write and publish his senti-
ments on all subjects, *being responsible for the abuse of that
right,* and no laws shall be passed to restrain or abridge the
liberty of speech or of the press."    This provision of the con-
stitution in common with all other provisions is subordinate
to the great leading purpose for which constitutional govern-
ments have been established, namely, to form a more perfect
government and to promote the general welfare, and, like
all fundamental rights, requires regulation to prevent these
rights from being abused, which is the law of liberty.    This
doctrine is forcibly and clearly expressed in the words:

"Power to determine such questions, so as to bind all, must
exist somewhere; else society will be at the mercy of the few,
who, regarding only their own appetites or passions, may be
willing to imperil the peace and security of the many, pro-
vided only they are permitted to do as they please.    Under
our system that power is lodged with the legislative branch
of the government.    It belongs to that department to exert
what are known as the police powers of the state and to de-
termine primarily what measures are appropriate or needful
for the protection of the political morals, the public health,
or the public safety."    *Mugler v. Kansas,* 123 U. S. 623,
660, 8 Sup. Ct. 273.

State v. Pierce, 163 Wis. 615.

Where the abuse of the purity of elections begins, through whatever means it be accomplished, liberty of speech and press must end, for without such a check this right could be made a most effective instrument of mischief. The Corrupt Practices Act was framed to guard against such mischiefs, and the legislature found its provisions appropriate and necessary to check existing evils, which threatened to subvert the rights and privileges of the elective franchise. In the light of the public evils and the pernicious influence on voters in elections which flow from the lavish expenditure of money, there is much justice and sound public policy in the legislative restrictions imposed on persons by the Corrupt Practices Act. No doubt exertion of the legislative power in this regard has its difficulties and embarrassments in order to preserve and protect the elective franchise from abuse and the rights guaranteed by liberty of speech and press. I am unable to concur in the view of the court that the provisions of sec. 12.05, Stats. 1915, are an unconstitutional invasion of the rights of freedom of speech and press. The regulations and conditions of this section are appropriate, reasonable, and in the legislative discretion necessary means in the scheme of the law to eradicate existing evils in elections, and hence do not conflict with the rights of free speech and press. I consider the enactment of the law a proper exertion of the legislative power and within the discretion which obviously animated the legislators in their vigilance to correct existing mischiefs that threaten to subvert the purity of elections, and that its provisions do not operate to unreasonably restrain or abridge the liberty of speech and press in the light of eradicating the evils that have grown up in the political field from lavish expenditures of money which menace the freedom and purity of the ballot.

I am authorized to state that Mr. JUSTICE KERWIN concurs in this dissenting opinion.