## THE STATE OF CONNECTICUT *vs.* JOHN A. McKEE.

Third Judicial District, Bridgeport, April Term, 1900.
ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

It is not essential that acts or conduct which the legislature prohibits and punishes as injurious to the public health, safety, or morals, should be such as would have supported an indictment at common law for nuisance or libel. While it is for the legislative department to pass upon the policy or expediency of any particular prohibition, it nevertheless remains for the courts to determine whether the specific acts which are forbidden as dangerous to public health, safety, or morals, are in fact such as lie within the domain of the law-making power, and if so, whether that power has been constitutionally exercised; and in adjudicating these questions the finding of the legislature upon the existence of public danger is entitled to weight, which, in case of serious doubt, may be controlling.

The Constitution of this State does not confer the right to publish matter injurious to the public morals, merely because the publication is true in point of fact.

Chapter 205 of the Public Acts of 1895, § 2, provides that every person who shall sell, or have in his possession with intent to sell, any paper "devoted to the publication, or principally made up of criminal news, police reports, or pictures, and stories of deeds of bloodshed, lust, or crime," shall be punished, etc. Upon a prosecution for a violation of this statute it was *held :* —

1. That the gist of the offense as charged consisted in disseminating, by means of a newspaper, accounts of immoral acts and conduct so massed and treated as to excite attention and interest sufficient to command circulation for a paper devoted mainly to the collection of such matters.

2. That the Act, in so far as it defined and punished this offense, was valid, and violated no constitutional provision relating to the freedom of the press.

3. That an information in the words of the statute was sufficient.

4. That the trial court erred in instructing the jury that the offense might be committed whenever the objectionable matter was a "leading feature" of the paper, or when "special attention" was devoted to the publication of such items.

5. That the question whether the newspapers in evidence were devoted to the publication of matters which fell within the statutory description, was properly left to the jury as one of fact.

6. That the trial court in submitting the case to the jury might express

State *v.* McKee.

its opinion upon the question whether the printed articles in evidence were or were not such as the statute contemplated.

7. That no error was committed in allowing each of the newspapers to go to the jury in its entirety, and in permitting the State's Attorney to designate those articles which he claimed fell within the statutory prohibition.

If the statute upon which a criminal prosecution rests is, for any reason, unconstitutional, a demurrer to the information should be sustained, although the reasons specified therein may not present the true ground of invalidity.

An Act ought not to be adjudged unconstitutional if its language is fairly susceptible of an interpretation which is consistent with its validity.

Every citizen has an equal right to use his mental endowments, as well as his property, in any harmless occupation or manner; but he has no right to use them so as to injure his fellow-citizens or to endanger the vital interests of society.

It is not for counsel to frame the charge of the court to the jury.

The constitutionality of a statute is a question for the court, whose opinion the jury are bound to accept as the law for that case.

The master cannot be held criminally responsible for his servant's act done under a mere general authority, unless such authority, in connection with the facts proved, impliedly covers the specific offense complained of.

Argued April 17th—decided May 22d, 1900.

INFORMATION for selling a newspaper devoted to and principally made up of criminal news, police reports, pictures and stories of bloodshed, lust and crime, brought to the Superior Court in New Haven County and tried to the jury before *Roraback, J.;* verdict and judgment of guilty, and appeal by the accused for alleged errors in the rulings and charge of the court. *Error and new trial granted.*

The information charged that "John A. McKee, etc., on the third day of September, A. D. 1899, unlawfully did sell to Phillip Lautenbach, offer, and have in his possession with intent to sell and offer, a certain paper devoted to the publication and principally made up of criminal news, police reports, pictures and stories of deeds of bloodshed, lust, and crime, which said paper then consisted of twelve pages, and at the top or head of the first of said pages were printed the words and figures following, to wit: 'Waterbury Herald.

Vol. 11, No. 602. Waterbury, Conn. Sept. 3, 1899. Price, Five Cents,' and at the top or head of each succeeding page of said paper were printed the words and figures following, to wit: 'Sunday Herald, Sept. 3, 1899,' against the peace," etc.

The information contained three other counts, each charging the sale, on a different date, of a different issue of the same paper. The defendant demurred to the complaint, and the demurrer was overruled.

The finding shows that upon the trial the State's Attorney offered in evidence a copy of the paper described in each count. The court, upon objection by the accused, ruled that the papers were admissible as tending to prove the charge in the information, and that they should go to the jury. The defendant excepted. The papers so admitted are marked as exhibits and appear in the record.

By agreement the State's Attorney and the attorney for the accused marked the articles to which they desired to call attention as supporting their respective claims.

The defendant presented in writing requests to charge, in the form of an extended and argumentative charge. The court declined to charge as requested.

The charge as given contained the following passages:

*First.* " In my opinion, gentlemen, the law upon which this prosecution is brought is a constitutional and valid one; but, under the limitations already stated, you are the judges of the law as well as of the facts, and it is for you to say on all the evidence, and under the law as you find it to be and as you conscientiously believe it to be, whether the accused is guilty or not guilty of the crime charged against him. The statute upon which this prosecution is based reads as follows: ' Every person who shall sell, lend, give, or offer, or have in his possession with intent to sell, transport, lend, give, or offer any book, magazine, pamphlet, or paper, devoted to the publication, or principally made up of criminal news, police reports, or pictures and stories of deeds of bloodshed, lust, or crime, shall be punished,' etc. As I have stated to you, this statute in my opinion is constitutional, and a valid police regulation.

*Second.* " A paper comes within the description of the offense alleged in the information, and also within the prohibition of the statute, if it is devoted to or principally made up of either criminal news, or police reports, or pictures and stories of deeds of bloodshed, or pictures and stories of lust, or pictures and stories of crime. Criminal news, within the intendment of the statute, means reports and articles concerning, relating to, and setting forth acts or conduct involving criminal wrong-doing. Police reports, within the intendment of the statute, means articles and statements concerning the doings of the police in the detection, arrest, or prosecution of criminals. Pictures and stories of deeds of bloodshed, within the intendment of the statute, means recitals or narratives, either true, false, or fictitious, of or relating to or involving deeds concerning the shedding of human blood: such as assaults, murder, manslaughter, and the like, and accompanied by representations of persons, forms, or scenes connected with, depicting, or portraying such stories.

*Third.* " The statute provides that the paper must be devoted to or principally made up of the news, reports, or pictures and stories mentioned in the statute. 'Devoted' to the publication of the matters in question, within the intendment of the statute, means that such matters are conspicuously and with especial prominence set forth and displayed therein. ' Principally made up ' of the matters in question, within the intendment of the statute, means that the matters in question shall appear in the paper in such quantity, prominence and arrangement, as to form or become a leading feature or characteristic of such paper. The words ' devoted to the publication of ' or the words ' principally made up of,' taken separately or together, do not necessarily imply or mean that any certain percentage of the space, or that the entire paper, shall be filled or occupied with the matter in question. These words and phrases do imply that the prohibited matter shall be a prominent and leading characteristic or feature of the publication. *That special attention shall be devoted* to the publication of the prohibited items. It is a question of fact for the jury to determine whether or not these papers or any

of them offered in evidence in support of the information are devoted to the publication or principally made up of criminal news, police reports, or pictures and stories of deeds of bloodshed, lust, or crime, within the rules already stated to you. It is also a question of fact for the jury to determine, upon all the evidence in the case, whether the accused or his agent, under the rules given, on or about the days alleged in the information sold or offered, or had in his possession with intent to sell or offer, said papers, or any of them, as charged in the several counts of the information.

*Fourth.* "In your deliberations you will carefully examine each paper in evidence, with the count based thereon, and determine as a matter of fact whether or not these papers or any of them come within the definition and prohibition of the statute in question."

The appeal assigns error in overruling the demurrer; in refusing to charge as requested; in the charge as given in each of the four passages above quoted; and in admitting in evidence the whole paper described in each of the counts.

*Levi N. Blydenburgh* and *Robert E. DeForest,* for the appellant (the accused).

*William H. Williams,* State's Attorney, for the appellee (the State).

HAMERSLEY, J.   The demurrer to the complaint was properly overruled.   The only reasons specified in the demurrer that call for notice, are these : " 3d. Because it (the Act of 1895, on which the prosecution was brought,) restricts the constitutional right to publish the truth.   4th. Because it is not alleged that the matter is obscene, blasphemous, scandalous, or libelous."

There is no constitutional right to publish every fact or statement that may be true.   Even the right to publish accurate reports of judicial proceedings is limited.   The substance of the rule is briefly stated by Judge Cooley in his work on Constitutional Limitations (p. 449) : " If the nature

of the case is such as to make it improper that the proceedings should be spread before the public, because of their immoral tendency, or of the blasphemous or indecent character of the evidence exhibited, the publication, though impartial and full, will be a public offense, and punishable accordingly." This rule applies with a far wider range to ordinary matters.

If the fourth specification implies that the power of the State to punish acts as injurious to the public health, safety or morals, is limited to acts within the adjudicated scope of the common-law offenses of nuisance and libel, it is unfounded. These elastic common-law crimes are based on the broad principle that conduct injurious to public health, safety and morals, may be restrained and punished by the State, although the same conduct, if harmless, cannot validly be prevented. Though defined by an unwritten law, the crimes in fact, like most common-law rules, depend on legislative authority, and may be restricted or extended by the same power. Upon a prosecution of the common-law offense, the question whether the conduct charged is injurious may be a question of fact for the jury; but there are cases in which the legislature may withdraw from the offense certain specified acts as not injurious, or may declare certain conduct to be injurious and make such conduct a statutory offense; when this is done, the injurious nature of the conduct is determined—subject in some instances to judicial review—by the legislature, and is not a question of fact involved in a prosecution under such statute. *State* v. *Main*, 69 Conn. 123, 133 ; *State* v. *Cunningham*, 25 id. 195, 203.

The definition of the perversion of the press to the injury of public morals, as the equivalent of conduct which at common law had been punished upon indictment for libel, is inadequate and unsound. It substitutes the effect for the cause. The law of libel as related to such conduct, rests upon the principle of the power and duty of the State to protect each citizen from malicious injury, and society from attacks upon its safety as well as from the pollutions of immorality, and is coincident in its range with a large portion of the field covered by that principle, but does not mark its limits.

This erroneous view was set forth with much ingenuity and ability in the argument of counsel reported in the comparatively recent case of *In re Rapier*, 143 U. S. 110 ; but the decision involved a condemnation of the view, although the opinion deals mainly with conclusions, without detailing the reasons, owing as the court states to the death of Mr. Justice Bradley who had been assigned to vindicate the conclusions.

If such an attempt to bottle up a broad principle of free government in the definite results of its past application could be made successful, it would in effect seriously narrow the freedom of speech and press as now understood, as well as cripple the State in affording that protection to the individual and the public from wrongful acts, which is a necessity to the enjoyment of real freedom.

It is, therefore, immaterial whether or not the conduct described in the statute has heretofore been held to be sufficient to support an indictment at common law for nuisance or libel. The legislature has declared that it does endanger public morals ; and this it has the power to do unless the court can say that such declaration is plainly unfounded.

If the fourth specification simply implies that an information under the statute must contain an allegation that the prohibited publications are obscene, etc., it is wholly without merit.

But the force of the demurrer is not entirely confined to the specified reasons. If for any reason the statute, or that portion of it under which the accused was prosecuted and punished, is unconstitutional or void, the demurrer should have been sustained.

The offense charged in the information is a violation of one of the provisions of § 2 of " An Act relating to Obscene Literature," passed in 1895 (Public Acts of 1895, Chap. 205, p. 558). Possibly the section may be framed with looseness, may in some particulars be open to a construction inconsistent with its evident purpose, and invite judicious revision ; but it is the duty of the court to give effect to a legitimate legislative purpose plainly indicated, if it can reasonably be

done, and not to construe language so as to invalidate an Act when the language is fairly susceptible of a construction consistent with validity. *State* v. *Brennan's Liquors*, 25 Conn. 278, 289; *Hartford Bridge Co.* v. *Union Ferry Co.*, 29 id. 210, 227; *Wilton* v. *Weston*, 48 id. 325, 338; *State ex rel. Andrew* v. *Lewis*, 51 id. 113, 127; *Miles* v. *Strong*, 68 id. 273, 287.

This Act is evolved from one directed to the suppression of obscene literature, passed in 1834, which appears in successive Revisions until and including that of 1875. In the last-named Revision it reads as follows: "Sec. 3. Every person, who shall . . . sell . . . any printed . . . matter, drawing or figure, of an obscene character, . . . shall be fined. . . . Sec. 4. Every person, who shall . . . introduce into any family, college, academy or school, any printed or engraved matter containing obscene language, . . . or any drawing or figure of an obscene character, shall be fined." pp. 512, 513. In 1879 the scope of § 4 was extended and the section amended to read as follows: "Every person who shall sell, or lend, or introduce into any family, . . . any obscene, lewd, or lascivious book, pamphlet, paper, . . . or other publication of an indecent nature, . . . shall be fined." Public Acts of 1879, p. 428. In 1885 the scope of § 3 was extended for the purpose of covering "obscene and immoral publications," by the repeal of the section and the substitution of the following: "Section 1. Every person who shall buy, sell, . . . or have in his possession with intent to sell, any obscene or indecent book, pamphlet, paper, . . . shall be punished by a fine. . . . Sec. 2. Every person who shall sell . . . any book, magazine, pamphlet or paper devoted wholly or principally to the publication of criminal news, or pictures and stories of deeds of bloodshed, lust or crime, shall be fined." Public Acts of 1885, p. 433. It is evident that this enlargement of § 3 was believed to cover the evil of introducing indecent literature into families, etc., which was punished by § 4 as amended in 1879; for this provision was dropped (without any prior repeal) in the Revision of 1888. It is also evident that the legislature here declares the dissemination of

publications of the kind specified to be dangerous to public morals, and that the designated publications are in fact such as deal with information of acts and conduct which are wicked and in violation of moral obligations : like lawless deeds of bloodshed, lustful or lascivious conduct, crimes or offenses involving similar immorality, and with matters of that nature made attractive in the treatment by pictures and by stories. The phrase "criminal news" is used in its wide signification of information of wicked and immoral acts of recent occurrence or discovery. The legislature in effect declares the concentration of items of this nature for circulation in publications devoted wholly or mainly to their collection, to be of immoral tendency, calculated to induce, especially among the young, the immoralities they are thus incited to dwell upon, and so to endanger the public morals. It is impossible to say that this declaration is without reason, or that such publications do not tend to public demoralization as truly as descriptions of mere obscenity. The statute therefore seeks to protect the public from this danger by punishing the selling and other dissemination of the designated publications.

In the Revision of 1888, § 1537 re-enacts the provisions against obscene publications contained in § 3 of the Revision of 1875 as enlarged by § 1 of the Act of 1885, and § 1538, like § 2 of the Act of 1885, punishes the spread of the specified immoral publications, thereby covering the evil of their introduction into families, schools, etc., so effectually as to induce the omission, from the Revision of 1888, of § 4 of the Revision of 1875 as amended in 1879. Section 1538 does not differ from § 2 of the Act of 1885, except in punctuation, and we do not think that difference alters the meaning.

In 1895 the various sections of the Revision of 1888 directed against the publication of obscene and immoral literature were amended and grouped in "An Act relating to Obscene Literature." Public Acts of 1895, p. 558. The principal alterations relate to punishment. Section 1538, as thus amended, reads : "Every person who shall sell . . . any book, magazine, pamphlet, or paper, devoted to the

publication, or principally made up of criminal news, police reports, or pictures and stories of deeds of bloodshed, lust, or crime," shall be punished. The offense here described is essentially the same as that described in § 2 of the Act of 1885. It may be committed in different ways. One way—which is the offense charged in the information—is by selling, or having in possession with intent to sell, a newspaper mainly devoted to detailing recent violations of moral obligations through acts of lawless violence, through conduct induced by lust, through crime; to illustrating such conduct by pictures, to revealing such conduct by stories. It is immaterial whether the paper is devoted to setting forth such immoralities in one or more of the manifestations last above indicated; in either case the offense is committed. The radical difference between the demoralizing effect of facts stated only as incident to the legitimate purposes of science or literature, and the same facts separated from their surroundings and massed for attractive presentation so as to fill the mind of the reader only with the immoralities they suggest, is too patent to need comment. The gist of the offense consists in disseminating by means of the newspaper, which finds its way into families, reaching the young as well as the mature, a selection of immoralities so treated as to excite attention and interest sufficient to command circulation for a paper devoted mainly to the collection of such matters.

We cannot say that the Act of 1895, in so far as it defines and punishes this offense, is void; and very clearly it does not violate any constitutional provision relating to the freedom of the press.

"Article First" of our Constitution contains a statement of certain "essential principles of liberty and free government," which constitute an underlying condition on which the delegation of power to the several governmental agencies is made, and so operate as limitations on the exercise of the sovereign power granted in broad terms to the legislative as well as to the executive and judicial departments. *State* v. *Conlon*, 65 Conn. 478, 489; *Norwalk St. Ry. Co.'s Appeal*, 69 id. 576, 589. Among these, the most important and vital

are the right to participate in the exercise of political power, and the right to the free exercise and enjoyment of religious profession and worship, as declared in the first four sections of the article. A corollary to these rights is the right to the free expression of opinion on public measures and men, and on religious tenets and controversy. This corollary is expressly declared in the following two sections of the article, *viz :* "Sec. 5. Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty. Sec. 6. No law shall ever be passed to restrain the liberty of speech or of the press." The primary meaning of "liberty of the press," as understood at the time our early constitutions were framed, was freedom from any censorship of the press ; from "all such previous restraints upon publications as had been practiced by other governments, and in early times here, to stifle the efforts of patriots towards enlightening their fellow subjects upon their rights and the duties of rulers." *Com.* v. *Blanding*, 3 Pick. 304, 313. But this fundamental guaranty goes further ; it recognizes the free expression of opinion on matters of church or State as essential to the successful operation of free government, and it also recognizes the free expression of opinion on any subject as essential to a condition of civil liberty. The right to discuss public matters stands in part on the necessity of that right to the operation of a government by the people; but, with this exception, the right of every citizen to freely express his sentiments on all subjects stands on the broad principle which supports the equal right of all to exercise gifts of property and faculty in any pursuit in life,—in other words, upon the essential principles of civil liberty as recognized by our Constitution. Every citizen has an equal right to use his mental endowments, as well as his property, in any harmless occupation or manner ; but he has no right to use them so as to injure his fellow-citizens or to endanger the vital interests of society. Immunity in the mischievous use is as inconsistent with civil liberty as prohibition of the harmless use. Both arise from the equal right of all to protection of law in the enjoyment of individual freedom of action,

State v. McKee.

which is the ultimate fundamental principle. This truth is plainly expressed in the language of Sec. 3 and of Sec. 5. The liberty protected is not the right to perpetrate acts of licentiousness, or any act inconsistent with the peace or safety of the State. Freedom of speech and press does not include the abuse of the power of tongue or pen, any more than freedom of other action includes an injurious use of one's occupation, business or property. In truth, freedom of speech and press, like freedom of other action, are necessarily protected by the first four sections of the article; and sections 5 and 6 are not essential for that purpose, except so far as they erect an arbitrary bar to any form of censorship of the press.

The general right to disseminate opinions on all subjects was probably specified mainly to emphasize the strong necessity to a free government of criticism of public men and measures. But it is specified as one of the conditions of civil liberty and, like other conditions of a similar nature, it necessarily involves the protection of those who may suffer from the wrongful exercise of any common right. The idea of immunity from molestation for the harmful use of opinion was perhaps not undreamed of in the convention of 1818, but it certainly was held to be inconsistent with true freedom. It may be significant of the views of the framers of our Constitution, that a section of Article First contained in its first draft, which prohibited the molestation of any person for his opinions on any subject whatever, was under the consideration of the convention during most of its session and was finally rejected without dissent. Journal of the Constitutional Convention of Conn. pp. 18, 75, 55.

The notion that the broad guaranty of the common right to free speech and free thought, contained in our Constitution, is intended to erect a bulwark or supply a place of refuge in behalf of the violaters of laws enacted for the protection of society from the contagion of moral diseases, belittles the conception of constitutional safeguards and implies ignorance of the essentials of civil liberty.

The Act of 1895 is valid in so far as it punishes the offense of which the accused was convicted. It is not necessary to

consider other provisions of the Act. Portions of a statute may be valid, although other portions may be unconstitutional. *State* v. *Wheeler*, 25 Conn. 290, 299. We say nothing as to the policy of such legislation; the only question before us is the one of validity. Legislation may or may not be adapted to accomplish a valid and beneficial purpose, and its utility or futility is for the consideration of the legislature. Somewhat similar statutes have been enacted in other States, and their validity has been sustained on the general lines we have indicated; although our attention has not been called to any case precisely analogous. *State* v. *Van Wye*, 136 Mo. 227, 234; *In re Banks*, 56 Kan. 242; *United States* v. *Harmon*, 45 Fed. Rep. 414, 416; *In re Rapier*, 143 U. S. 110, 134.

It was competent for the State's Attorney to charge the offense in the words of the statute. *State* v. *Carpenter*, 60 Conn. 97, 106; *State* v. *Costello*, 62 id. 128, 131; *Strohm* v. *People*, 160 Ill. 582, 584.

The errors alleged in denying the requests to charge are sufficiently considered in the discussion of the charge as given. To a large extent the requests were so framed that the court properly refused to incorporate them in the charge. It is not for counsel to frame the charge of the court.

The first passage in the charge to which objection is made is not open to the error assigned. The court correctly charged that the statute, in so far as it created the offense for which the defendant was prosecuted, is a constitutional and valid law. But it did err in telling the jury that they were judges of its constitutionality. The validity of a statute is a question of law to be settled by the court, and the jury are bound to accept the opinion of the court as the law for the case. *State* v. *Main*, 69 Conn. 123, 132.

The second passage objected to could hardly have injured the defendant. It relates to the interpretation of the language of the statute, *viz:* " Criminal news, police reports, or pictures and stories of deeds of bloodshed, lust, or crime." As we have seen, this language means wicked and immoral acts and conduct set forth in the form of news; that is, accounts of events of that nature, or in the form of statements

State *v.* McKee.

of or articles concerning the doings of the police in the detection and prosecution of offenses of that nature; or in the form of pictures as well as stories of matters of that nature, *i. e.* deeds of bloodshed, of lust, or of crime which is a violation of law involving wicked and immoral acts and conduct. This language designates one class of matter, *i. e.* wicked and immoral conduct as manifested in one or more of the forms specified. *Strohm* v. *People, supra,* p. 586.

The third passage objected to contains material error. The gist of the statutory offense is the massing of these immoralities in one publication for circulation, and demands that the paper shall be mainly or principally devoted to the publication of such material. The law cannot be evaded by intermingling other material, whether for the purpose of evasion or of securing attention to the main subject-matter, so long as the principal resulting effect is the circulation of this massed immorality; but that main result must appear, or the offense is not committed. The offense does not depend on the motive; it is immaterial whether the motive is the gain to be derived from the circulation, the advertising, or the involuntary contributions of those desirous of escaping publicity, or is simply the gratification of a malicious disposition, or is a genuine conviction of the reforming efficiency of a portrayal of all manifestations of crime and immorality; but the offense .does depend upon the devotion or dedication of the columns of the paper mainly to the publication of the matters designated by the statute. The charge, therefore, in stating that the offense may be committed whenever the objectionable matter is a leading feature of the paper or when special attention is devoted to the publication of the prohibited items, fails to state the full meaning of the statute. It may be doubtful whether such an imperfect statement in this case in fact injured the defendant, but it is possible that it did.

The court properly left to the jury the determination, as a question of fact, whether the papers in evidence were thus devoted to the publication of material claimed to be within the statutory description.

The charge on the question of agency is hardly as full as it should be, in view of the evidence and claims. The papers were sold at the defendant's shop in his absence; if sold by one acting under the express or implied authority of the defendant to make that sale, the charge that the defendant sold is proved. There is a distinction between a civil and a criminal case in respect to the effect on the responsibility of the master, of a mere general authority given to a servant. In a criminal case the authority must cover the specific act complained of. In statutory offenses consisting in the sale of articles in violation of regulations for securing public order, the authority to a servant to sell the particular article charged as sold by the master may, without proof of any specific authority, be inferred from various circumstances: such as the relation of shopkeeper and selling clerk, coupled with proof that the article sold was placed by the master in the shop among other things that were to be sold; carelessness or negligence of the master in providing or keeping the articles sold, and other evidence that legally tends to prove that the sale was made with the knowledge or consent of the master; provided such evidence does in fact satisfy the jury beyond a reasonable doubt that the servant in selling the article acted in pursuance of authority from the master. *State* v. *Curtiss*, 69 Conn. 86, 89; *Com.* v. *Stevens*, 153 Mass. 421.

In the fourth passage objected to, the court seems to instruct the jury to determine, as a matter of fact, without aid from the court, whether the publications in evidence are such as the statute describes. The question whether the defendant sold a paper devoted to the publication of matters described in the statute, was properly submitted to the jury as one of fact. But if the fact of the sale and the fact that the paper sold was devoted to the publication of a class of matter therein contained, were uncontested or admitted, then the question whether that class of matter comes within the statutory definition may be treated by the court as one of law. So where all the elements are contested, the court, in submitting the whole question to the jury as one of fact, may instruct them as to the principles by which they should be

guided in determining the application of the statute to the publication, and may express its opinion that the printed matter in evidence is or is not such as the statute designates. *Haight* v. *Cornell*, 15 Conn. 74, 83; *Donaghue* v. *Gaffy*, 54 id. 257, 266; *Rosen* v. *United States*, 161 U. S. 29, 42.

The court did not err in admitting the several exhibits; they are before us and it is clear that they tend to prove the allegations of the charge. The whole paper alleged to be sold in violation of the Act must go to the jury. It is proper for the State's Attorney to designate the articles he claims to be within the statutory definition; and this was done.

There is error and a new trial is ordered.

In this opinion the other judges concurred.