THE STATE OF CONNECTICUT *vs.* TIHON SINCHUK ET AL.

Third Judicial District, New Haven, June Term, 1921.

WHEELER, C. J., BEACH, GAGER, CURTIS and BURPEE, Js.

Chapter 312 of the Public Acts of 1919, entitled "An Act concerning Sedition," prescribes a fine and imprisonment for "any person, who shall speak, or write, print and publicly exhibit or distribute, or who shall publicly exhibit, post up or advertise any disloyal, scurrilous or abusive matter, concerning the form of government of the United States, its military forces, flag or uniforms, or any matter which is intended to bring them into contempt or which creates or fosters opposition to organized government." In a prosecution under this Act the accused, who were aliens, attacked its constitutionality. *Held:*—

1. That the statute was not fairly open to the objection that it fixed no ascertainable standard of guilt, inasmuch as the principles of the common law governing the publication of defamatory matter, furnished all the analogies necessary to define the nature and cause of this branch of the accusation.

2. That the Act itself was a declaration by the legislature that the publication of the prohibited forms of expression did endanger the public peace and safety; and that this declaration was within the province of the General Assembly, unless the court could see that it was plainly unfounded—a conclusion untenable in the present case.

3. That the accused, being aliens, clearly had no constitutional right to share in the privilege and responsibility of attempting to change our laws or forms of government (Constitution of Connecticut, Bill of Rights, §§ 2, 5, 6, 16), and therefore no right, under the pretense of being so employed, to engage in scurrilous or anarchistic propaganda which the legislature had declared to be dangerous to the public welfare.

No one can challenge a statute as unconstitutional, unless he can show that its enforcement against him has violated, or will violate, his constitutional rights; and the application of this rule or principle obviously cannot deprive one of the equal protection of the laws.

Prima facie, publications which have been forbidden by the legislature because dangerous to the public welfare, are abuses of the privilege of free speech.

Argued June 7th—decided August 4th, 1921.

INFORMATION charging the accused with violation of Chapter 312 of the Public Acts of 1919, entitled An Act concerning Sedition, brought to and reserved by the Superior Court in Fairfield County (*Maltbie, J.*) for the advice of this court, on the issues of law raised by a demurrer to the information. *Superior Court advised to overrule the demurrer and to enter judgment pursuant to the stipulation.*

The information charges "that on the 14th day of March, 1921, at Bridgeport in said County, Tihon Sinchuk and Alexander Yavsk, not being citizens of the United States or of the State of Connecticut, and residing in said Bridgeport, with force and arms did publicly exhibit or advertise certain disloyal, scurrilous or abusive matter concerning the form of government of the United States and of its flag and certain matter which was intended to bring them into contempt, or which creates or fosters opposition to organized government, against the peace and contrary to the statute in such case made and provided." The offenses are charged in the exact language of the statute, but no excerpts from the matter complained of are included in the information, and no statement of the facts in the case is contained in the record.

To this information the accused demurred: (1) because the information is insufficient in law; (2) because it does not state facts constituting an offense; and (3) because the statute is unconstitutional and void in that it violates §§ 2, 5, 6, 9 and 16 of Article First of the Constitution of Connecticut, § 9 of Article I of the Federal Constitution, and also the Sixth and Fourteenth Amendments thereof. The stipulation reserving the issues of law, raised by the demurrer of the accused to the information, recites that the cause is ready for plea and final judgment, and it is further stipulated that no question shall be raised by the defendants

based upon any informality in the information, or upon any defects therein, because of the failure to incorporate in the information specific quotations from the matter complained of. The only questions discussed in argument or on the briefs were those relating to the constitutionality of the statute.

·  *Walter Nelles* of New York City, with whom, on the brief, were *Isaac Shoor* of New York City, and *Abe S. Geduldig,* for the accused.

*Homer S. Cummings,* State's Attorney, with whom, on the brief, were *Galen A. Carter,* Assistant State's Attorney, and *Warren F. Cressy,* for the State.

BEACH, J.  The statute in question is entitled "An Act concerning Sedition"; and on its face it appears to penalize three classes of publications: (1) disloyal, scurrilous or abusive matter, concerning the form of government of the United States, its military forces, flag or uniforms; (2) any matter intended to bring them into contempt; (3) or which creates or fosters opposition to organized government.  The demurrer, and the stipulation accompanying the reservation, waive all defenses except the unconstitutionality of the statute.

The brief for the accused presents this defense in three aspects, which are described as to some extent overlapping: first, because it fixes no ascertainable standard of guilt and amounts to delegation to courts and juries of the legislative function of defining statutory offenses; second, because it oversteps the police power and deprives of liberty without due process of law, in penalizing expression for its character regardless of relation to harmful consequence; third, because it contravenes specific limitations on the police power,

namely, the free-speech sections, the right of the people to adapt their form of government in accordance with their opinion, and the right of remonstrance.

In support of the first of these propositions the defendants rely mainly on *United States* v. *Cohen Grocery Co.*, 255 U. S. 81, 41 Sup. Ct. 298, holding that § 4 of the Lever Act (41 U. S. Stat. at Large, 298), penalizing the making of "any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries," was unconstitutional because it did not fix any ascertainable standard of guilt, and did not inform persons accused of violation thereof of the nature and cause of the accusation against them. To the same effect are *International Harvester Co.* v. *Kentucky*, 234 U. S. 216, 34 Sup. Ct. 853; *Collins* v. *Kentucky*, 234 U. S. 634, 34 Sup. Ct. 924; *American Seeding Machine Co.* v. *Kentucky*, 236 U. S. 660, 35 Sup. Ct. 456. These last cases arose under statutes forbidding combinations to fix a price greater or less than the "real value " of the article dealt in; and the attempt was to determine criminality by asking the court or jury to say what the real value of the article would have been had the combination not existed. On the other hand, a criminal statute is not unconstitutional merely because it throws upon men the risk of rightly estimating the effect of their conduct upon a condition of fact; e. g., what is "undue restraint " of trade, *Nash* v. *United States*, 229 U. S. 373, 33 Sup. Ct. 780; whether their conduct is "reasonably calculated" to restrain trade, *Waters-Pierce Oil Co.* v. *Texas*, 212 U. S. 86, 29 Sup. Ct. 220; whether their language tends to encourage or advocate an actual breach of the law, *Fox* v. *Washington*, 236 U. S. 273, 35 Sup. Ct. 383; or whether a newspaper is "principally made up of criminal news", *State* v. *McKee*, 73 Conn. 18, 46 Atl. 409. And coming closer to the point, we have upheld a statute which penalized the publication

of "any offensive, indecent, or abusive matter, concerning any person." *State* v. *Pape*, 90 Conn. 98, 96 Atl. 313. Of this statute, we said that it must be construed consistently with the principles of the common law governing the publication of all defamatory matter, and with the constitutional provision that in all actions of libel the truth shall be a defense.

Applying the principles underlying these authorities to the present case, we think the statute is not fairly open to the objection that it fixes no ascertainable standard of guilt. The phrase "disloyal, scurrilous or abusive matter," is confined specifically to the form of government of the United States, its military forces, flag or uniforms, and the principles of the common law governing the publication of defamatory matter, in so far as they are applicable, furnish all the analogies necessary to define the nature and cause of this branch of the accusation. Whether the publication in question was with intent to bring the form of government of the United States and its flag into contempt, is an issue of fact such as is presented in most criminal prosecutions. Whether the publication creates or fosters opposition to organized government, is also an issue of fact no more uncertain than the question whether a publication is obscene.

The second objection is that the Act penalizes expression for its character regardless of relation or harmful consequence. This objection, both in its form and in the mode in which it was presented in argument and on the brief, stands by itself and does not involve the third objection above stated. It deals not with the alleged violation of any specific limitation on the exercise of the police power, but with the reasonableness of the prohibition as measures for the public peace and safety. It may be admitted that the publication of matter concerning the form of the Federal

Government, which is merely scurrilous or abusive, is not necessarily a direct incitement of disobedience to any other law, but it is not necessary to look outside of the statute itself to find a legal basis for criminality, because the Act itself is the declaration of the General Assembly that the publication of the prohibited forms of expression does endanger the public peace and safety. This declaration it has power to make unless the court can see that it is plainly unfounded. *State* v. *McKee,* 73 Conn. 18, 24, 46 Atl. 409. We have no doubt that a sufficient probability of danger to the public peace and safety arises from publications concerning the government of the United States and of its flag, which would come within the common-law definition of defamatory matter, to justify the statute so far as its first two clauses are concerned. Defamatory publications seem as dangerous to the public welfare when addressed to the national government as when addressed to an individual. *State* v. *Pape,* 90 Conn. 98, 96 Atl. 313. As to the final clause of the statute, it is idle to say that anarchistic propaganda are harmless in the law.

We come now to the question, which also underlies the objections already discussed, whether the statute contravenes any specific provision of the Bill of Rights, or of the Federal Constitution. Section 2 of the Bill of Rights in the Constitution of this State, provides "that all political power is inherent in the people and all free governments are founded on their authority, and instituted for their benefit; and that they have at all times an undeniable and indefeasible right to alter their form of government in such manner as they may think expedient." This section is plainly inapplicable to the defendants. The information alleges, and the demurrer admits, that the defendants are not "citizens of the United States or of the State of Connecticut." The right affirmed by this section is the right of the

people to alter "their form of government." It is because it is their own, and instituted by themselves for their own benefit, that they have the right to alter it. The proposition that aliens have an undeniable and indefeasible right to alter our form of government will hardly bear statement.

Section 16 provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance." This section is also inapplicable. No right of peaceable assembly is invaded by the statute, and there is nothing to show that the publications in question were addressed, for any purpose whatever, to those invested with the powers of government. The allegations of the information and the admissions of the demurrer do not indicate that such was the fact, and the inference to be drawn from the admission that the publications were of the character described in the statute, would lead to another conclusion.

Sections 5 and 6 of the Bill of Rights are as follows:— "5. Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege. 6. No law shall ever be passed to curtail or restrain the liberty of speech or of the press." If we are right so far, the next question is whether matter of the kind described in the statute and information is of such a constitutionally privileged character that its publication by the defendants may not be punished, although dangerous to the public welfare. The defendants attempt to maintain that their publications are so privileged, and are a legitimate exercise of the right of free speech, by what is, in practical effect, an appeal to § 2 of the Bill of Rights. They quote from *State* v. *McKee*, 73 Conn. 18, 28, 46 Atl.

409: "The right to discuss public matters stands in part on the necessity of that right to the operation of a government by the people "—and they say: "There is a public necessity, however, that public matters should be freely discussed. . . . Is it not the law that such discussion, even though potentially harmful, may not be punished—is not an 'abuse' of free speech—so long as it does not amount to direct and positive incitation of harm? " The distinction thus attempted is in principle a familiar one between harmful utterances intended to incite resistance or disobedience to law, and the same harmful utterances intended only to secure a change in the law; the latter, though dangerous, being justified by the inalienable and indefeasible right of the people to alter their political institutions. 21 Columbia Law Review, 526. The question, then, recurs, whether the defendants, being aliens, possess that right. We discuss that question, and then the question whether the denial of that right to aliens violates the requirement of the Fourteenth Amendment, that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

The defendants' brief does not argue the question whether § 2 of the Bill of Rights applies to aliens. It simply assumes that aliens are included in the term "the people," and then uses the assumption that the defendants are exercising the constitutional right of altering their form of goverment as a plea of privilege for the publication of matter which the legislature has declared to be dangerous to the public peace and safety. Prima facie, publications which have been forbidden by the legislature, because dangerous to the public welfare, are abuses of the privilege of free speech. Unless the defendants can successfully claim the right of unlimited political discussion, they cannot say that the statute deprives them of any constitutional privilege.

The question whether aliens are entitled to the benefit of the reservations of personal liberty guaranteed to citizens and to the people in our Bill of Rights, is not altogether a new question in this State. In *Jackson* v. *Bulloch*, 12 Conn. 38, the question arose, in a writ of *habeas corpus*, whether a slave could be held in servitude in Connecticut by her owner who had brought her here with a view to a temporary residence. The petitioner relied both upon the Constitution and upon the slavery statutes then in force. On the latter ground she prevailed, but in discussing the constitutional question we said, p. 42: "The Bill of Rights, in its first section, declares that all men, when they form a social compact, are equal in rights; and that no man, or set of men, are entitled to exclusive public emoluments or privileges from the community. The language is certainly broad; but not as broad as that of the Bill of Rights in Massachusetts, to which it has been compared. It seems evidently to be limited to those who are parties to the social compact thus formed. Slaves cannot be said to be parties to that compact, or to be represented in it." And of § 8 of the Bill of Rights, we said: "The eighth section of the Bill of Rights has also been pressed upon us: that 'the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches or seizures.' This is almost a transcript of the Fourth Article of the Amendments of the Constitution of the United States. And the fact that this Amendment was adopted at all, and that amidst all the conflict of opinions upon the subject of slavery, this clause has never been claimed to affect that subject, shows very strongly, that it was not intended to apply to that description of persons. When the preamble to the Constitution of the United States speaks of 'WE, THE PEOPLE—to secure the blessings of liberty to ourselves and our posterity, do ordain

and establish this constitution,' it cannot be seriously contended, that it included that class of people called slaves; and the term 'people ' in the Bill of Rights, must have been used in a similar sense."

The principle underlying this portion of the decision applies to the present case with added force, for the second section of the Bill of Rights, declaring that all political power is inherent in the people, cannot refer to aliens, who have no political power; nor can the declaration that the people have at all times an undeniable and indefeasible right to alter their form of government, refer to aliens, who have no part nor lot in the government.

Turning back to the free-speech sections, § 5 declares that "every citizen " may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty. This privilege is on its face confined to citizens. And § 6, that no law shall ever be passed to curtail or restrain the liberty of speech or of the press, plainly refers to the liberty of speech and of the press conferred by § 5 on citizens.

We do not mean to say that aliens have no right of free speech. If the General Assembly should undertake to declare a comprehensive consorship of the press, and an alien newsdealer should be prosecuted for selling a book or a newspaper which had not been passed by the censor, the statute could not be enforced against him. And for the reason that the business of newsdealing is a matter of private concern, and is a business in which aliens, who are duly admitted to the United States under our immigration laws, have an inherent right to engage, and having that right, they are entitled to the equal protection of the laws in the conduct of that business. *Yick Wo* v. *Hopkins*, 118 U. S. 356, 6 Sup. Ct. 1064; *Truax* v. *Raich*, 239 U. S. 33, 36 Sup. Ct. 7. We do, however, lay it down as a self-

evident proposition, supported in principle by *Jackson* v. *Bulloch,* 12 Conn. 38, that aliens have no constitutional right to share in the privilege and responsibility of attempting to change our laws or forms of government, and hence that they have no right, under cover of being engaged in good faith to accomplish those ends, to engage in scurrilous or anarchistic propaganda which has been declared by the General Assembly to be dangerous to the public welfare. It follows that, so far as aliens are concerned, the General Assembly has a right to pass a statute forbidding or penalizing the publication of such propaganda. And as it is a principle of constitutional law that no one has a right to attack a statute as unconstitutional unless he can show that its enforcement against him has violated or will violate his constitutional rights, the defense of unconstitutionality is not open to the defendants in this action. *Tyler* v. *Judges of the Court of Registration,* 179 U. S. 405, 21 Sup. Ct. 206; 6 R. C. L. p. 89, and numerous cases cited in the note to § 87.

The remaining question is whether this conclusion deprives the defendants of the equal protection of the laws. Evidently not, for the question whether the statute is enforceable against citizens is not before us. We simply hold that the defendants, being aliens, do not possess the right of attempting to alter our form of government, and for that reason are not qualified to plead the privilege of unlimited political discussion, on which their defense, that the statute violates the second, fifth and sixth sections of the Bill of Rights, is founded.

We may add that if this defense had been pleaded by a citizen, it would have been by no means clear that the statute might not be construed so as to avert most, if not all, of the criticism directed against it. *State* v. *McKee,* 73 Conn. 18, 46 Atl. 409; *State* v. *Pape,* 90 Conn. 98, 96 Atl. 313.

We have already indicated that the first and second clauses of the statute are to be construed in the light of the principles of the common law governing the publication of defamatory matter. And while the construction of the statute as a whole is not required or permitted by this record, it is a fair question—Professor Freund to the contrary notwithstanding—whether the second section of the Bill of Rights justifies the publication of anarchistic propaganda.

The Superior Court is advised to overrule the demurrer and to enter judgment pursuant to the stipulation.

In this opinion GAGER, CURTIS and BURPEE, Js., concurred.

WHEELER, C. J. (dissenting). This appeal involves questions of highest importance which justify a statement of the grounds of this dissent and of my view upon these questions.

I assume that the information charges three offenses: publicly exhibiting or advertising (1) certain disloyal, scurrilous or abusive matter concerning the government of the United States and its flag; (2) certain matter which was intended to bring them into contempt; (3) certain matter which creates or fosters opposition to organized government.

The matter thus generally characterized is not set forth in the information, either in terms or in substance. The court has no means of ascertaining whether, on its face, the matter is any of the things the State charges. Under our law the accused must be informed of the nature of the crime with which he is charged. Criminal procedure of universal acceptance requires that the information for criminal libel should set forth the charge, either in the terms made,

or so fully that, by reference, its terms can be wholly known.   Wharton's Criminal Law (Vol. 3, 11th Ed.) §1982, says: "The alleged libelous matter, also, must be set out accurately, any variance being fatal."   Section 1983: "It is enough now to say that if the indictment does not on its face profess to set forth an accurate copy of the alleged libel in words and figures, it will be held insufficient on demurrer, or in arrest of judgment."   Wharton's Criminal Procedure (Vol. 2, 10th Ed.) § 921, says: "An indictment or information alleging libelous matter should set it out *in hæc verba,* a mere statement as to the meaning and effect of the words being insufficient."   Various authorities are cited in support of this principle of criminal procedure.   Other text-books make a like statement.   17 R. C. L. § 228, p. 465; Newell on Slander & Libel (3d Ed.) pp. 1160, 1161.   In reported cases of criminal libel, we find the libel set forth in the information.   *State* v. *McKee,* 73 Conn. 18, 46 Atl. 409, is not in conflict.   There the information, which was sustained, charged the accused with having in his possession, with intent to sell, a paper devoted to criminal news, and described the issue of the paper so that it could be identified.   The practical objection to incorporating the entire newspaper as a part of the information led to the ruling made.

The parties herein, by counsel, stipulated "that no question shall be raised upon appeal by the defendants based upon any informality in the information, or upon any defect therein, because of the failure to incorporate in the information specific quotations from the matter complained of."   My brethren assume that this stipulation of counsel removes this question from the case.   I do not think it should be regarded as doing this.   What is there in the stipulation which would compel the accused to plead guilty to this charge

after the judgment herein? An agreement not to press a point upon an appeal is far from an agreement to plead guilty after the appeal is determined. It is true that counsel for the defendants say in their brief that "the defendants have agreed to submit themselves for punishment if this statute is held valid," but such agreement is no part of the stipulation of record. Again, what is there in the stipulation which prevents these defendants from urging this point upon a motion in arrest? What is really determined by the majority opinion? Only this, that it is possible to conceive of matter which these defendants may have published which would offend this statute. But what that matter is which is within the statute, the opinion cannot name. One judge hereafter may have one view, another another view. The decision does not make for certainty in the law, but the reverse; and it may well be that the justices who concur had different matter in mind as constituting the charge. Other reasons suggest themselves, but these seem to be sufficient reasons why the court should refuse to regard this stipulation, and should determine the first and second grounds of demurrer—that the information is insufficient and does not state facts constituting an offense—to be well taken. When we consider the situation of these defendants—aliens—whose counsel have stipulated away their fundamental right to have the charge against them set out with reasonable certainty, and that this stipulation may be construed as their agreement that they have been guilty of inciting violence, murder and revolution against the United States, with the intention of subverting its government, we may well stop to ask whether intelligent aliens, understanding their rights and the penalty of their agreement, would ever have made the stipulation counsel have made for them.

A court should be most careful to see that the rights of these aliens under our law are fully protected, and if there is a reasonable possibility that they may not have fully understood the effect of their stipulation, and that it does deprive them of a right which is vital to a fair trial and a fair consideration of their case, the court ought not to permit the action of counsel, or their action upon the advice of counsel, to prevent a consideration of their cause without this elementary safeguard.

As we examine the nature of these charges it will become more apparent that the court ought not to determine the grave questions raised on this appeal without having before it the matter charged to have been published. I agree that what is disloyal, scurrilous or abusive matter concerning the government of the United States and its flag, and whether matter was intended to bring these into contempt, can be ascertained by our courts by the application of the definitions and principles known to our common law, so that it cannot be said that this statute fixes no ascertainable standard of guilt. Nor do I think this statute oversteps the police power in depriving these defendants of liberty without due process of law, by penalizing expression without regard to harmful consequences. Publications which degrade or throw into contempt the government of our country, necessarily tend to incite and encourage breach of the peace. The constitutional guaranty of free speech gives to every person who comes within the United States the right to discuss publicly any subject, so long as its object and effect be not to disturb the peace of individuals or of families, the quiet of society, or the existence of government, Federal or State. "The liberty protected is not the right to perpetrate acts of licentiousness, or any act inconsistent with the

peace or safety of the State. Freedom of speech and press does not include the abuse of the power of tongue or pen, any more than freedom of other action includes an injurious use of one's occupation, business or property." *State* v. *McKee,* 73 Conn. 18, 29, 46 Atl. 409. Any published matter which tends to degrade, vilify, or bring into contempt the government of the United States or its flag, is libelous, and libels of this nature are seditious and criminal. The law presumes harmful consequence may result from their use, for this is a natural consequence. Newell on Slander & Libel (3d Ed.) § 1090; 2 Wharton's Criminal Procedure (10th Ed.) § 911.

Had the matter which the defendants are charged with publicly exhibiting been set up in the information, the demurrer would then have raised the question whether this matter fell within the characterization. No hard and fast rule can automatically determine this. The circumstances surrounding the matter and its nature, must in each case be considered in the light of the accepted legal definitions of these terms, where such exist, and, if they do not exist, then they must be considered by the exercise of a judgment formed after a consideration of applicable legal principles.

Aside from the objection that the matter which creates or fosters opposition to organized government, is not stated in the information, this particular count is bad for other reasons. It does not state whether the opposition created or fostered was by means of force or by means calculated to, that is, likely to, incite or encourage the use of force or a breach of the public peace, or whether it was a purely speculative discussion without relation to the accomplishment of evil purpose. The constitutional right of free speech does not give any one the right to create or foster opposition to the government of the United States, or

The State *v*. Sinchuk.

of this State, by the advocacy of force or the incitement of means calculated to destroy or subvert or injure the government or the peace of the community. The majority opinion assumes that the charge is against the United States or this State. But specification three of this information is not personal to the United States or this State. The opposition charged is to all organized government. Such opposition may intend present danger to government, by inciting the use of force or of opinions, beliefs or arguments likely to subvert or injure government. If it be opposition of this kind which is created or fostered, our constitutional guaranty of free speech does not protect one in such form of opposition. But if it be a purely philosophical or speculative discussion of the condition of society without the restraints and burdens of any government, it cannot be said that this will be likely to subvert or injure government. Such discussion has no relation to any particular government. The Constitution of the United States, and our Bill of Rights, forbid the abridgment of freedom of speech and of the press, and their guaranties forever do away with some of the restraints and limitations to which this fundamental right had been subjected not so many years before these constitutional enactments. But the exercise of this vital adjunct of freedom does not countenance licentiousness of speech, nor seditious utterances; and such utterances are those which incite or encourage the use of force, or means which injure government or are likely to injure government. In passing upon an indictment under the Espionage Act (40 U. S. Stat. at Large, 217) for preventing recruiting by named illegal acts, the Supreme Court, by Mr. Justice Holmes, said: "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will

bring about the substantive evils that Congress has a right to prevent." *Schenck* v. *United States*, 249 U. S. 47, 52, 39 Sup. Ct. 247. Publications inciting or encouraging revolution in another country, the subversion of its government, the murder of its rulers, or any evil to its government by the use of force, would clearly fall without the liberty of speech guaranteed by the Constitution; and so would publications which are likely to produce these effects. For these would be seditious libels and would properly subject their authors to criminal penalty. Whether language is or is not likely to produce such an effect, is the dividing line between what is and what is not seditious libel. While this determination is difficult, it is one to which courts are accustomed. A breach of the peace may occur by any act likely to produce violence. 1 Bishop, New Criminal Law, § 536. And a libel has been indictable, time out of mind, because it tends to produce violence. *People* v. *Most*, 171 N. Y. 423, 429, 64 N. E. 175.

In determining whether a libel is likely to injure organized government, a court will be careful to be sure of its ground that danger clear and imminent is likely to result from the publication, since it must never forget that freedom of speech is an indispensable prop of our free government, and that "repression of full and free discussion is dangerous in any government resting upon the will of the people." Cooley's Constitutional Limitations (7th Ed.) p. 614. Whether the statement is seditious libel, we test by the question: "Is the language calculated to promote public disorder, or physical force or violence in a matter of State? " Odgers on Libel & Slander (5th Ed.) p. 513.

No case and no authority, so far as we discover, goes so far as to penalize mere opinion concerning government or its institutions, without regard to evil conse-

quences occurring or likely to occur. This we suppose to be the meaning of the Supreme Court of the United States when it says: "We understand the State court by implication, at least, to have read the statute as confined to encouraging an actual breach of the law. Therefore the argument that this Act is both an unjustifiable restriction of liberty and too vague for a criminal law must fail. It does not appear and is not likely that the statute will be construed to prevent publications merely because they tend to produce unfavorable opinions of a particular statute or of law in general." *Fox* v. *Washington*, 236 U. S. 273, 277, 35 Sup. Ct. 383; *Schenck* v. *United States*, 249 U. S. 47, 39 Sup. Ct. 247; *State* v. *Tachin*, 92 N. J. L. 269, 274, 106 Atl. 145. Newell on Slander & Libel (3d Ed.) § 1090, thus states the rule: "Mere theoretical discussions of abstract questions of political science, comparisons of various forms and systems of government, and controversies as to details of our own constitutional law, are clearly permissible."

The language of the statute before us is not limited to matter which incites or encourages, or which is likely to so incite or encourage, opposition to all organized government. It may include a philosophical or theoretical discussion, without regard to means or effect, which may remotely be held to incite or encourage such opposition. A statute cannot do this without violating the constitutional guaranties of free speech. The majority opinion does not construe this statute as one which is confined to the incitement or encouragement of force, or which is likely to produce this result. What it really decides is that aliens such as the accused have no right "to engage in scurrilous or anarchistic propaganda which has been declared by the General Assembly to be dangerous to the public welfare." It fails to discuss that phase of the right of

free speech which is involved, and holds the statute good against aliens. I think the State has the right to prohibit the publication of matter which is disloyal, scurrilous or abusive concerning the government of the United States and its flag, or which is intended to bring them into contempt, whether it be published by a citizen or by an alien. Our treatment of this subject so far is equally applicable to citizen or alien. Our Bill of Rights, with few exceptions, and all of our fundamental constitutional guaranties, are for the protection of the alien as well as the citizen. I agree with my associates that §§ 5, 16 and 17 of our Bill of Rights are, by their terms, applicable to citizens alone. I also agree that the right to alter our form of government, as guaranteed by § 2, is the exclusive privilege of the citizen. Aside from these sections, our Bill of Rights protects aliens and citizens alike. I do not agree that § 6 of our Bill of Rights is confined to citizens. That section provides: "No law shall ever be passed to control or restrain the liberty of speech or of the press." While denying to aliens the protection of this section, my associates say: "We do not mean to say that aliens have no right of free speech." But the right of free speech which they accord the alien is a very limited one, unprotected by Constitution and restricted by judicial construction. I cannot believe that this position is sound. I cannot find the parallel between the slave and the alien, and so treat *Jackson* v. *Bulloch*, 12 Conn. 38, as controlling the judgment, as my associates do.

So far as the right of free speech is concerned, the distinction between the rights of citizen and alien does not exist, except as to the specific guaranties given to citizens alone. The Fourteenth Amendment was enacted "to secure equal rights to all persons." *Ex parte Virginia*, 100 U. S. 339, 347. And when it

says: "Nor shall any State deprive any person of
life, liberty, or property, without due process of law;
nor deny to any person within its jurisdiction the equal
protection of the laws," it included the alien within
the term "any person." "These provisions are uni-
versal in their application, to all persons within the
territorial jurisdiction, without regard to any differences
of race, of color, or of nationality; and the equal pro-
tection of the laws is a pledge of the protection of
equal laws." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369,
6 Sup. Ct. 1064; *Truax* v. *Raich*, 239 U. S. 33, 39, 36
Sup. Ct. 7. We quote from a few of the many au-
thorities: "The equal protection of the laws is due
to aliens as to citizens." Cardozo, J., in *People* v.
*Crane*, 214 N. Y. 154, 162, 108 N. E. 427. "An alien
friend, however transient his presence may be, is en-
titled to a temporary protection, and owes in return
a temporary allegiance." *Fisher, Brown & Co.* v. *Field-
ing*, 67 Conn. 91, 104, 34 Atl. 714. "These rights and
privileges [of aliens] include both personal rights—
such as the right to dwell safely in the country, the
general right to engage in any lawful labor, trade, or
business within the State, and the right of protection
to person, reputation and other relative rights—and
property rights. . . . In return for the protection
given aliens they owe a temporary and local allegiance
to the country in which they reside, which continues
during the period of their residence." 2 Corpus Juris,
1046; 2 Cyc. 89.

That the Fourteenth Amendment guarantees freedom
of speech, is unquestioned. But apart from this, Con-
necticut is ever bound to maintain a republican form
of government. *Beach* v. *Bradstreet*, 85 Conn. 344, 349,
82 Atl. 1030. And a republican form of government
without the right of free speech, would be an anomaly.
The statute in question, on its face, applies to "any

person," be he citizen or alien; and the constitutional guaranty of free speech does not prevent any State penalizing seditious libel, whether committed by alien or citizen. Citizen or alien, who publicly exhibits matter which creates or fosters opposition to organized government by force, or is likely to produce force or disorder, will be guilty of a criminal or seditious libel. And if this statute were confined to this, it would not violate the right of free speech. But since it goes further, and penalizes all speculative or philosophical matter without regard to its actual or likely effect, it does in this respect violate the right of' free speech which the Constitution of Connecticut and of the United States guarantees to alien and citizen alike.